**UNITED STATES of America**
v.
**Lloyd Odin LAWSON, Appellant.**
**No. 14492.**

United States Court of Appeals
Third Circuit.
Argued March 3, 1964.

Decided Oct. 20, 1964.

Hiram Elfenbein, Montague, N. J., for appellant.

J. Norris Harding, Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S. Atty., Newark, N. J., on the brief), for appellee.

Before McLAUGHLIN and FORMAN, Circuit Judges, and LEAHY, District Judge.

FORMAN, Circuit Judge.

Lloyd Odin Lawson (hereafter the appellant) was convicted under an indictment charging him with violating the Universal Military Training and Service Act, 50 U.S.C. App. § 462.[1] He was tried in the United States District Court for the District of New Jersey with a jury and was sentenced to a term of two years imprisonment. The execution of the sentence was suspended and

---

1. The indictment charges:
"That on the 20th day of August, 1962, at Greystone Park, in the State and District of New Jersey
"LLOYD ODIN LAWSON
who was a registrant with Selective Service Local Board No. 24 for New Jersey and required by law, according to a written order entitled 'ORDER TO REPORT FOR CIVILIAN WORK AND STATEMENT OF EMPLOYER', dated August 7, 1962, to appear and report to Local Board No. 24 on the 20th day of August, 1962, where he would be given instructions to proceed to the New Jersey State Hospital, Greystone Park, New Jersey, and being required by law, according to the same written order, to proceed and report for employment in civilian work contributing to the maintenance of the national health, safety, and interest at the New Jersey State Hospital, Greystone Park, New Jersey, on the 20th day of August, 1962, and having appeared and reported to Local Board No. 24 on the 20th day of August, 1962, did knowingly, wilfully and unlawfully fail and neglect to proceed and report to the place of employment aforesaid and thereby did knowingly, wilfully and unlawfully fail, neglect and refuse to perform a duty required of him by the Universal Military Training and Service Act and regulations made pursuant thereto."

**804**

he was placed on probation for five years subject to a special condition that he should report to the New Jersey State Hospital at Greystone Park, New Jersey, for civilian work for a period of two years. He now appeals from the judgment of conviction and sentence.

Much testimony was adduced and many documents were presented at the trial from which it appeared that: The appellant was born March 26, 1938 in Jersey City, New Jersey. He registered under the Selective Service System with Local Board No. 24 for New Jersey. He returned his classification questionnaire to the Board on June 29, 1957, in which he claimed that by religious training and belief he was conscientiously opposed to war in any form. He requested the Board to furnish him with a special conscientious objector form (SSS Form 150).

Upon its receipt he filled it in, indicating that he was a Christian of no particular sect, but that, under the guidance of his parents, he had engaged in Bible study and discussions, as a result of which he reached the conclusion that he could not conscientiously participate in war. He returned the form September 12, 1957. After the lapse of considerable time and opportunity for appellant to substantiate his request the Board, on May 18, 1961, classified him as a conscientious objector.

Having been ordered to report, on August 2, 1961, for a physical examination, appellant, on August 1, 1961, wrote the Board:

"To take the physical examination is in conflict with my conscientious beliefs. Please be advised I will not take the physical examination.

"I wish to inform you that I am willing to perform civilian work that contributes to the maintenance of national health, safety or interest."
He did not take the physical examination.

Thereafter, various exchanges took place between the Board and appellant concerning the civilian work in which he could engage in lieu of induction into the Armed Forces.

On October 17, 1961, the Board wrote appellant, stating that within the next ten days he should report and make application for maintenance, hospital, or institutional work in one of the following institutions in New Jersey: State Hospital at Greystone Park; the Neuro-Psychiatric Institution at Skillman; or the State Hospital at Marlboro.

In a letter dated October 27, 1961, appellant replied stating that only two of the institutions had answered his letter inquiries, and that the only position open was institutional attendant. Regarding this position, he wrote:

"I believe it is my duty to inform you, within the ten day limit of your letter, of October 17, 1961 that I am not offering to perform the limited choice of job open to me."

Again, various exchanges between the Board and appellant concerning civilian work in lieu of induction took place culminating in a meeting at the office of the Board on June 21, 1962, attended by appellant, members of the Board, and a representative of the State Director. It was agreed there that appellant should apply for a job the next day, June 22, at the New Jersey State Hospital, Greystone Park, New Jersey.

On June 26, 1962, the appellant visited the Greystone Park State Hospital for an interview and filled out an application for employment there. John G. Matybell, the personnel assistant of the Hospital, who interviewed appellant, stated at the trial that to the best of his knowledge, he neither accepted nor rejected appellant's application for a job. He also testified:

"I told him about the jobs that were available at the present time and he didn't say either yes or no that he would accept them or that he wouldn't."

Appellant testified that Mr. Matybell promised to notify him by letter when a position was open for which he was fit. Contrariwise, Mr. Matybell stated at the

trial that to the best of his knowledge he did not remember promising to so inform him since "[m]ost of the correspondence is handled through the Selective Board."

In response to the Board's letter the State Hospital informed the Board by letter dated June 28, 1962 that the position of institutional attendant at $59 per week was available. "If Mr. Lawson was interested in this type of employment," the letter of the Hospital continued, "I [Thomas M. Russo, personnel director] would appreciate having him complete and return the enclosed application."

In a letter dated August 7, 1962, appellant informed the Board that since July 4, 1962 he had been working for Goodwill Industries in Jersey City, New Jersey. It was his belief that this job fulfilled his civilian work obligation, since it appeared on a list of approved agencies and projects at Selective Service Headquarters in Newark during January of 1962. Goodwill Industries, however, had no such approval in New Jersey at that time though it was on the approved list of other states. The Board notified appellant of this fact by letter dated August 17, 1962.

Before receiving appellant's letter of August.7, 1962, a copy of an order was mailed to him on that same date, the substance of which is as follows:

"SELECTIVE SERVICE SYSTEM
ORDER TO REPORT FOR CIVILIAN WORK
AND STATEMENT OF EMPLOYER

August 7, 1962
(Date of mailing)

"To Lloyd Odin Lawson
(First name) (Middle name) (Last name)
28 24 38 85
(Selective Service No.)

"Mailing address 1709 Summit Avenue Union City
(Street and number) (City)
New Jersey
(Zone) (State)

"Having been found to be acceptable for civilian work contributing to the maintenance of national health, safety, or interest you have been assigned to Institutional Work located at New Jersey State Hospital, Greystone Park, New Jersey.

"You are ordered to report to the local board named above at 9 A. M. on 20th day of August, 1962, where you will be given instructions to proceed to the place of employment.

"You are ordered to report for employment pursuant to the instructions of the local board to remain in employment for twenty-four (24) consecutive months or until such time as you are released or transferred by proper authority.

"You will be instructed as to your duties at the place of employment.

"Failure to report at the hour and on the day named in this order, or to proceed to the place of employment pursuant to instructions, or to remain in this employment the specified time will constitute a violation of the Universal Military Training and Service Act, as amended, which is punishable by fine or imprisonment or both.

/s/ NANCY M. KUKOWSKI
Nancy M. Kukowski, Clerk
(Clerk or Member of the Local Board)"

In a letter dated August 15, 1962, appellant acknowledged receipt of the order notifying him to report for a civilian work assignment at the New Jersey State Hospital on August 20. In addition, he again indicated a belief that his work at Goodwill Industries fulfilled the requirements of a civilian work assignment.

In a letter dated August 17, 1962, the Board notified appellant that Goodwill Industries is not approved by the State of New Jersey although approved in other states. This letter reiterated to appellant that he should "report as ordered to this Local Board on Monday, August 20, 1962, at 9:00 A.M. to be forwarded to the New Jersey State Hospital at Greystone, New Jersey."

On August 20, 1962, the Board received a letter from Colonel MacGrath, State Director of the Selective Service System. It stated, among other things:

"While the Goodwill Industries appear on the list of approved employers, the State Director of New Jersey has never approved any of their projects for employment of conscientious objectors in New Jersey.

"Inasmuch as the Director has approved the order to civilian work, the above registrant should be expected to report as ordered."

On August 20, 1962, the appellant reported at the office of the Board. He told Miss Nancy M. Kukowski, the Clerk of the Board, that he had not yet received the letter dated August 17, 1962. In addition, he said that he would like postponement for a few days of the order to report to the State Hospital so that he could, according to Miss Kukowski, "clear up some business." She replied that there could be no postponement and he was expected to report to the New Jersey State Hospital that day. Miss Kukowski stated that appellant then answered that

he had to take care of some business first.

Appellant has conceded that he failed to go to the New Jersey State Hospital on August 20, 1962.

The State Director of Selective Service wrote to appellant on August 27, 1962. He stated that appellant's work with Goodwill Industries in Jersey City, New Jersey could not be approved. Two of the reasons set forth in the letter were:

"* * * Goodwill Industries have not been approved by this Headquarters and also according to the National Policy of the Selective Service System, as set forth in Section 1660.21(a) of Selective Service Regulations, conscientious objectors are not assigned to civilian work projects located in the same area in which they reside." [2]

The letter also observed: "[Y]ou are under continuing duty to comply with the order of your local board to report for civilian work at the New Jersey State Hospital, Greystone Park, New Jersey."

On January 16, 1963, the indictment of the appellant was filed, followed by trial and conviction, as heretofore stated.

— I —

Appellant contends that counsel for the Government made improper remarks during his summation to the jurors which were prejudicial and inflamed them against him to such an extent as to constitute grounds for reversal.

He points to the following statement by the prosecuting attorney toward the end of his closing address in which he said:

"* * * Do you believe that when that man testified that the rubber stamp stopped him from going down that that was the truth? Of the 800,000 other people who get

---

2. Section 1660.21(a) of the Selective Service Regulations provides:

"(a) No registrant shall be ordered by the local board to perform civilian work in lieu of induction in the community in which he resides unless in a particular case the local board deems the performance by the registrant of such work in the registrant's home community to be desirable in the national interest." 50 C.F.R. § 1660.21(a) (1962).

these orders through the mail 99.9 per cent of them comply. They don't have any problem here. And this man didn't have any problem either."

\* \* \*

" \* \* \* We don't come before you as an atheistic government, we are a nation of laws and as Abraham Lincoln said, a nation under God, under God. And at Gettysburg he said we are here to remember those men and so that this nation under God, under God, shall have a new birth of freedom. And those men at Gettysburg, ladies and gentlemen, they were buried and they fought and they died. I don't know whether they had Selective Service laws in those days—they probably volunteered, they probably volunteered because they loved their country and they were willing to see that something was done for it. And now they are buried in the ground.

"And this is why we are here today and this is why we are a nation of strong and independent people. \* \* \* " 3

There were no objections in any form by counsel for appellant to those comments by the Government. He raised his objection for the first time on appeal, asserting that the closing remarks of the Government "insinuated untruthfully that the defendant was atheistic."

■■ If counsel for the appellant believed his adversary committed prejudicial error in his closing argument to the jury, he should have made this known to the court. Besides preserving the matter for appeal, he thereby would have afforded the trial court an opportunity to cure the error, if any, by rebuke, precautionary instruction to the jury, or some other action.4

Appellant, accordingly has a difficult burden to sustain in attempting to show that the closing remarks of the Government so aroused religious prejudices as to be reversible error. To be successful, he must bring this prosecution within those "exceptional cases where justice would require us to reverse even though defense counsel voiced no objection to the prosecutor's remarks at the time." 5

■ To be sure, Federal Rule of Criminal Procedure 52 6 requires the recognition of errors affecting substantial rights regardless of whether they were brought to the attention of the court. Appellate courts always may notice errors which are obvious or which seriously affect the

---

3. The quotation was prefaced with the sentence: "The Government isn't being anti-religious in this case." There followed this final passage:
" \* \* \* And that's why you ladies and gentlemen of the jury are sitting here today, because our forefathers saw fit that no man should be found guilty of a crime except he is adjudged that by a jury of his peers. These are the things we have to protect in this case. And I say to you it will be protected and this nation will endure and this man should be found guilty beyond any doubt whatsoever.
"Thank you very much."

4. This court, in another case, has not hesitated to characterize language used by counsel for the Government in his closing address, as being "deplorable." Yet, an absence of any objection to the remarks at the time of their utterance weigh heavily in the determination that they are not actually prejudicial. In United States v. Kravitz, 281 F.2d 581, 587 (3 Cir. 1960), the late Judge Goodrich, in a similar situation, said:
" \* \* \* We think the defendants' lawyer is not entitled to lie low, say nothing and to bring up this fleeting argument months afterward as a basis of reversal."

5. United States v. Kravitz, *supra* note 4, at 587 n. 10.

6. This rule provides:
"*Rule 52. Harmless Error and Plain Error*
"(a) *Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."
"(b) *Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

fairness, integrity, or public reputation of judicial proceedings.[7]

Indeed, counsel for appellant, himself, based part of his argument as to his client's innocence on religious references. The injection by appellant's counsel of this aspect in his summation may well have inspired the comments made by Government's counsel.[8]

It is not inferable that the questioned portion of the Government counsel's summation was for the purpose of implying that appellant was an atheist. Rather it was for the purpose of arguing that historically the Government had, like appellant, a religious background. The prosecution felt, apparently, that it would be at a disadvantage if appellant's praising of religion were greater than the Government's.

■ Whether this kind of emotional appeal to the jury, by both the appellant and Government, was germane or aided the rational search for truth is questionable. But, the portion of the summation of the Government, to which this complaint was addressed, occasioned no infringement on any substantial rights of appellant. It was merely an effort to show that the Government was not being antireligious in the prosecution of the case.

In addition, appellant objects to other statements in the closing address of the Government. Allegedly, these comments "inflamed the jury against him by virtually accusing him of being a hypocrite, and intimating and probably influencing the jury to believe that the defendant [appellant] was a liar and a slacker." Appellant bases this charge on these specific portions of the closing argument of Government's counsel:

"It is a little bit sad, and I think we made a mistake, there has been a mistake in this case and the mistake was when Selective Service headquarters ever classified him as a CO. He should have been 1-A. He is no more of a conscientious objector than the man in the moon. He is a conscientious objector and he won't show up at a mental hospital to do work which he acknowledged was in the national health, welfare and interest? And where are we going to be if we continue to get people like that? How about these 800,000 registrants? * * * This man would be content to fiddle while this country burned down. That is what he would do. * * * Sure he had a chance to volunteer. He was given a year. Read those regulations on this instrument, this document that Mr. Elfenbein is circulating, and it says if you are a conscientious objector—and that isn't any longer in this case, he was a conscientious objector, although I say we probably made a mistake in doing that."

7. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), where the Supreme Court stated:
"* * * Of course appellate courts 'in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.' See United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555. * * *"

8. At about the midway point of his summation to the jury, appellant's counsel remarked:
"When this jury was first being called you will remember I made very pronounced efforts to get on this panel the most intelligent, the most educated and the *most religious people* I could find with the extent of my challenging ability of eliminating those who did not meet my requirements. As far as I was able you thirteen individuals were the most intelligent, the most educated and the *most religious obtainable*." (Emphasis added.)
Later, counsel for appellant stated:
"* * * And I see no basis in morality, in common sense and in my conception of law that could warrant an educated and *religious minded jury*—and the alternate—to find that the defendant was guilty of knowingly, wilfully and unlawfully violating this order." (Emphasis added.)

Again, counsel for appellant made no objection at the trial to these comments. He now raises his objection for the first time.

Throughout the trial the prosecution took the position that the Board had classified the appellant as a conscientious objector. It submitted as the only issue in the case that he had failed to comply with the obligation of this classification by ignoring what the Government contended was a valid order to report for civilian work at a State Hospital.

In the heat of dispute in this trial, some latitude must be given to lawyer's language.[9] Of course the Assistant United States Attorney who tried the case as a representative of the Government is not an ordinary party to a controversy. Though he must prosecute with earnestness and vigor, he also must refrain from improper methods.[10] His interjection of his personal belief that the Board erred in classifying the appellant as a conscientious objector can be said to be improper. But, after all, the Government based its case on the proposition that the Board correctly classified appellant as a conscientious objector. Its dissatisfaction with appellant, as already stated, was with his alleged failure to fulfill his duties as such.

We are not persuaded that the remarks of the Government's counsel concerning the draft classification of appellant were such plain error as to command reversal. Moreover, notwithstanding the lack of objection by appellant, the District Court in its charge adequately cared for any confusion on this topic.[11] Furthermore, it would be unrealistic to believe that the jurors in this case were so lacking in common sense as to allow the comments of Government's counsel on the draft classification of appellant to have a prejudicial effect in their eyes.[12]

In a similar vein appellant without registering an objection at the trial[13] now takes exception to the following language of Government's counsel in his summation:

"* * * And then he [appellant] takes the stand, he says I have no knowledge about regulations and this and that and everything else, but I looked at this rubber stamp and I said this can't be any good. Where do you think he got that? He didn't know he was supposed to report to Greystone so he wrote in a letter dated August 15, 1962, 'I am in receipt of the order ordering me to go to Greystone.' That is what he wrote."

Appellant argues that the prosecution insinuated in the above paragraph that he was lying when he said that he did not believe that Form 153, dated August 7, 1962, was a genuine work order, "for if it were it would not have a rubber stamp instead of a signature."

9. United States v. Kravitz, *supra* note 4, at 586.

10. Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 87 L.Ed. 734 (1943).

11. In his charge the District Court Judge stated:
"So that I think you understand at this time, members of the jury, that you should dismiss from your minds whether or not the defendant was properly classified 1-O [the conscientious objector classification] for during the course of his trial the defendant admitted that the classification 1-O was proper and correct. You understand, according to the evidence in this case, that this defendant was conscientiously opposed to participation in war in any form and was therefore classified 1-O by his local board."

12. See United States v. Kravitz, *supra* note 4, at 586, in circumstances far more objectionable than here, where this court said:
"* * * To say that this remark would have a prejudicial effect on a jury which had listened throughout a long trial to the unfolding of the testimony is to attribute a stupidity and absence of common sense which is incredible in a federal jury. * * *"

13. Appellant interrupted the summation at this point but only for the following interjection:
"Mr. Elfenbein: Is that document in evidence?
"The Court: That is in evidence.
"Mr. Elfenbein: Number 41."

The letter written by appellant on August 15, 1962 [14] actually said:

"I wish to acknowledge your letter in which you notify me to report for a civilian work assignment at New Jersey State Hospital, Greystone Park, New Jersey on August 20, 1962."

Thus appellant charges his letter did not specifically admit that he had received the "order ordering me to Greystone." Appellant contends that it merely stated that he had received a "letter in which you notify me to report for a civilian work assignment."

■ Both documents eventually went to the jury where they were available for such evaluation as it determined they deserved. We cannot agree with appellant that the discrepancies in the prosecution's statement of the contents of appellant's letter of April 15, 1962 constituted a "deliberate distortion of a written document by the prosecution on such a major issue, as to when the defendant first made up the story he told on the stand" and constituted "a grave abuse of the defendant's rights to a fair jury trial." It is true that Government's counsel did not accurately quote from appellant's letter and attributed the word "order" to him instead of the word "letter." It is obvious, however, that he was not reading from appellant's letter the verbatim contents. His statement was not, as appellant contends "an uncalled for fabrication." Nor do we find that appellant's letter contained, as appellant urges, "no such language as quoted." The alleged quotation was reasonably accurate.

■ The appellant also contends that the remark "Where do you think he got that?" was a "reprehensible innuendo that the defendant's testimony was prompted by his lawyer." The question was unclear and at best rhetorical. It had, however, no consequences prejudicial to appellant.

In short, a scrutiny of all of appellant's fine tooth combing of the closing address of Government's counsel leaves us unconvinced that the appellant was unduly prejudiced or the jury inflamed by any statement to which he has taken exception on this appeal.

—II—

Appellant contends that his conviction should be reversed also on the ground that portions of the charge of the District Court were "contradictory, inconsistent and confusing."

Appellant presented no objection at the end of the charge except to the definition of "reasonable doubt." [15] But, any error alleged to have been made in the definition of "reasonable doubt" has not been laid as a ground for this appeal.

Federal Rule of Criminal Procedure 30 [16] provides that a party may not assign

14. Defendant's Exhibit 20.

15. "The Court: Now, unless there are some exceptions to the charge the jury may take the case.

"Mr. Yauch (Assistant U.S. Attorney): No exceptions, sir.

"Mr. Elfenbein (Appellant's counsel): One, your Honor.

"(The following was at the side bar:)

"Mr. Elfenbein: May I make a sentence or two off the record?

"The Court: Oh, no, on the record.

"Mr. Elfenbein: On the record. I recognize that the definition that the Court gave of reasonable doubt is one generally accepted and hoary with age in legal precedence. I, however, contend that it is utter meaningless in actual language and therefore I take exception to the charge, * * *"

"The Court: Also that there are certain defendant's requests to charge; if I haven't covered all of them let it be understood that you may take exception to my failure to charge those which I didn't. And here they are and you may incorporate them."

16. The rule in part states:

" * * * No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

as error any part of the charge unless he states distinctly the matter and grounds of his objection. Plainly, appellant failed to do this.

Considerations of assuring the accused a fair trial, however, will prevail over the important policy of having counsel point out errors immediately so that correction can occur then and there.[17] In short, if the error is basic and highly prejudicial[18] the appellate court must give effect to the plain error rule,[19] which protects the substantial rights of the accused. Hence our inquiry is whether the charge amounted to plain error.

The portion of the charge against which the appellant mounts his attack is:

"And may I say at this time, members of the jury, that *you are to give no consideration to the fact that the defendant has been employed by the Goodwill Industries,* since July 4, 1962, because that employment was not in compliance with the order of August 7, 1962. Such employment, as I stated, is not in compliance with the work order issued. *But you may use this fact* in determining whether his act in not complying with the order of August 7, 1962, was knowingly, wilfully and unlawful. *Neither are you to consider, members of the jury, the fact that the defendant went to Greystone Park* in June 1962 and filled out a questionnaire. This, too, was not in full compliance with the work order. *But again you may consider this fact* in determining whether his failure to comply with the work order was done unlawfully, knowingly and wilfully." (Emphasis added.)

Appellant contends that this was a "clear cut, definite and unconditional" instruction to the jury that it should give no consideration to the appellant's job at Goodwill Industries, and that it is "contradictory, ambiguous and confusing" with regard to an ensuing statement wherein the District Court said: "But you may use this fact in determining whether his act in not complying with the order of August 7, 1962, was knowingly, wilfully and unlawful." Appellant complains that the same confusion and contradiction appear in the next three sentences of the charge. When the District Court charged: "[Y]ou are to give no consideration to the fact that the defendant has been employed by the Goodwill Industries," it referred only to the argument of the appellant that this job fulfilled appellant's work obligation.

After the statement that no consideration should be given to the Goodwill Industries employment, the Court stated: "But you may use this fact in determining whether his act in not complying with the order of August 7, 1962, was knowingly, wilfully and unlawful." The use of the first word in this sentence—"But"—shows that the court was creating an exception to its general instruction that no consideration could be given to the Goodwill employment. Owing to the closeness of time in these pronouncements, it is unlikely that any confusion occurred in the comprehension of the charge by the jury.

When the District Judge also said: "Neither are you to consider members of the jury, the fact that the defendant went to Greystone Park in June 1962 and filled out a questionnaire," he was referring to the argument of the appellant that going to Greystone Park on June 26, 1962 fulfilled the order of the Board directing appellant to report there on August 20, 1962. After that statement the court went on to say: "But again you may consider this fact in determining whether his failure to comply with the work order was done unlawfully, knowingly and wilfully." The use of the two

17. United States v. Cumberland, 200 F.2d 609, 611 (3 Cir. 1952).

18. United States v. Malfi, 264 F.2d 147, 151 (3 Cir.), *cert. denied,* 361 U.S. 817, 80 S.Ct. 57, 4 L.Ed.2d 63 (1959).

19. Fed.R.Crim.P. 52, *supra* note 6.

# 812

words at the commencement of the sentence—"But again"—shows that the court was once more simply creating an exception to the general instruction.

Any possible confusion that occurred by reason of the court's statement that no consideration may be given to the employment at Goodwill or the June visit to Greystone was inconsequential. A reading of the charge and its sequence of sentences demonstrates that the court correctly presented the issues and that the jury could readily comprehend them.

We must assume that the jury possessed and exercised common sense [20] in following the charge of the court. We are convinced that appellant's attack upon the charge of the Trial Judge must fail.

## — III —

We now turn to other contentions, among the many advanced by the appellant, that his conviction should be reversed. He submits that the Board exceeded its authority in issuing the order to the appellant to report for civilian work in that it violated the statute and regulations pertaining to such orders. He complains that the evidence at the trial raised issues of fact concerning the validity of the order of the Board which should have been decided by the jury under proper instruction of the Trial Judge, but that the Judge failed to give such instructions though requests for the same were submitted by the plaintiff. Instead, the Judge instructed the jury that the order to report for civilian work was validly issued as a matter of law.

Among the shortcomings alleged to invalidate the order are: The Clerk of the Board appended her signature to the order of August 7, 1962 with a rubber stamp; the Clerk was not authorized by the Board to sign or issue the order; and no proof was made of minutes of the Board recording such action.

It is true that the signature of the Clerk on the order was by rubber stamp. It is equally true that the regulations disapprove rubber stamps.[21] Failure, however, to conform to the regulations and to other similar procedural provisions cannot be held to deprive the Board of its jurisdiction as appellant contends. Absent some showing of prejudice to appellant due to the failure on the part of the Board to comply with the formal procedural directive of a regulation, an order of the Board, otherwise within its power to issue, will not be invalidated.

Similarly, a regulation provides that official papers may be signed by the clerk of a board if he is authorized to do so by regulation duly adopted and entered in the minutes of the meetings of the Board.[22] In this case, the Clerk of the Board, on cross examination by appellant, testified that she was authorized to do so by resolution of the Board. No subpoena had been served upon her by appellant to produce the resolution. The Trial Judge requested her to produce it later. The production of the resolution, however, was never followed up at the trial. The testimony of the Clerk that the resolution existed was never disputed. If the appellant seriously contested the existence of appropriate delegation of authority to the Clerk to sign the order he had ample opportunity to press the contention, but did not do so. Here, again, the requirement of the resolution for authority to sign may be regarded as directory to the Board rather than mandatory. Its absence does not

---

20. See United States v. Malfi, *supra* note 18.

21. *"Signatures.*

"Signatures affixed to official papers of the Selective Service System must be written in pen and ink by the person signing. Rubber stamp facsimiles will not be used." 32 C.F.R. § 1606.24 (1949).

22. *"Signing official papers.*

"Official papers issued by a local board may be signed by the clerk of the local board if he is duly authorized to do so by resolution duly adopted and entered in the minutes of the meetings of the local board, * * *." 32 C.F.R. § 1604.59 (1949).

excuse non-compliance with an otherwise valid order of the Board to report for civilian work.

■ The appellant is entitled to full protection of his procedural rights, but he may not insulate himself against the requirement that he perform his obligation under the Selective Service Law by relying on mere procedural irregularities which expose him to no prejudice.

In United States v. Hagaman, 213 F. 2d 86, 91 (3 Cir. 1954) Judge Goodrich, speaking for this court sitting en banc, although in a dissenting opinion, said:

"It is one thing, however, to protect a man when he is prejudiced by the failure of administrative authorities to observe the precautions taken to guard his rights. It is another thing to create an administrative procedure, designed to be handled by volunteer laymen in communities throughout the nation, as technical and ritualistic as common law pleadings. We have said in an earlier opinion that a registrant is not obliged to make his points with his draft board in the fashion required of a well-trained lawyer, United States ex rel. Berman v. Craig, 3 Cir., 1953, 207 F.2d 888. It is likewise true that the board's proceedings do not need to be recorded with the meticulous accuracy with which an experienced corporation counsel draws a set of corporate minutes."

■ The appellant further objected that the alleged order of the Board, dated August 7, 1962, requiring him to report for civilian work was rendered invalid by the following asserted deficiencies: There was no minute or resolution of the Board authorizing or deciding the type of civilian work to be performed by the appellant; the order itself did not explicitly "order" appellant to report for civilian work but rather recited that it had "assigned" him to institutional work; the order required him to report only to the Board; and the directive contained in that order as

to the instructions he would receive to proceed to the New Jersey State Hospital at Greystone Park was too vague.

There was ample evidence that the Board was in full agreement in its recommendation that he should perform civilian work at the New Jersey State Hospital at Greystone Park. Though a formal resolution was not produced, a written minute to this effect was received in evidence. To debate whether the order was an "order" or an "assignment" to engage in civilian work is purely an excursion in semantics which avails appellant nothing. And the assertion that the "order" was too "vague" to properly instruct him where to engage in civilian work is without any substance. The evidence is clear that appellant knew that he was ordered to the New Jersey State Hospital at Greystone Park, for it is undisputed that he appeared at the office of the Board on August 20, 1962, as directed, and informed the Clerk of the Board, among other things, that he would not go to the Hospital because other business claimed his attention.

■■ The appellant also contended that he was excused from reporting because the Board was not present at its headquarters when he reported on the appointed day for the purpose of requesting a postponement and that the Clerk of the Board acted outside the scope of her authority when she denied him such a postponement. Of course there was no requirement that the Board should be present on his arrival at the office. His request for a postponement of the date for him to report at the Hospital, made on the very day he was due there, was untimely. Its rejection by the Clerk of the Board was the only course she could take under the circumstances.

The appellant complains that the Board misconstrued his status in that he was processed for civilian work as a non-volunteer conscientious objector when he should have been processed as a volunteer conscientious objector. He refers to his communication to the Board of August 1, 1961, in which, among other things, he advised that he "was willing

to perform civilian work that contributes to the national health, safety or interest." He contends that upon the receipt of this information from him it was the duty of the Board to forward to him for execution Selective Service Form 151 entitled "Application of Volunteer for Civilian Work", and that he should have been processed accordingly under Section

23. *"Volunteering for civilian work.*

"Any registrant who is between the ages of 18 and 28 and who has been classified in Class I-O, or who claims eligibility for classification in Class I-O, may volunteer at his local board for civilian work contributing to the maintenance of the national health, safety, or interest in lieu of induction. The local board shall promptly classify any such volunteer who claims eligibility for Class I-O. Each such volunteer who is in Class I-O and who has been found acceptable for service after his armed forces physical examination shall be processed in the same manner as a volunteer for induction except that, in lieu of induction, he shall be ordered by the local board to perform civilian work contributing to the maintenance of the national heath, safety, or interest as defined in § 1660.1." 32 C.F.R. § 1660.10 (Jan. 9, 1962). Section 1660.1 of the Regulations provides:

*"Definition of appropriate civilian work.*

"(a) The types of employment which may be considered under the provisions of section 6(j) of title I of the Universal Military Training and Service Act, as amended, to be civilian work contributing to the maintenance of the national health, safety, or interest, and appropriate to be performed in lieu of induction into the armed forces by registrants who have been classified in Class I-O shall be limited to the following:

"(1) Employment by the United States Government, or by a State, Territory, or possession of the United States or by a political subdivision thereof or by the District of Columbia.

"(2) Employment by a nonprofit organization, association, or corporation which is primarily engaged either in a charitable activity conducted for the benefit of the general public or in carrying out a program for the improvement of the public health or welfare, including educational and scientific activities in support thereof, when such activity or program is not principally for the benefit of the members of such organization,

1660.10 of the Regulations of the Selective Service System.[23]

It is conceded that such a form was never sent to the appellant. Instead appellant was supplied with Selective Service Form No. 152, entitled "Special Report for Class I-O Registrant", pursuant to section 1660.20 of the Regulations.[24]

association, or corporation, or for increasing the membership thereof.

"(b) Except as provided in paragraph (a) (2) of this section, work in private employment shall not be considered to be appropriate civilian work to be performed in lieu of induction into the armed forces by registrants who have been classified in Class I-O." 32 C.F.R. § 1660.1 (1952).

24. *"Determination of type of civilian work to be performed and order by local board to perform such work.*

"(a) When a registrant in Class I-O has been found qualified for service in the Armed Forces after his armed forces physical examination or when such a registrant has failed to report or to submit to armed forces physical examination, he shall, within ten days after a Statement of Acceptibility (DD Form No. 62) has been mailed to him by the local board or within ten days after he has failed to report for or submit to armed forces physical examination, submit to the local board three types of civilian work contributing to the maintenance of the national health, safety, or interest, as defined in section 1660.1, which he is qualified to do and which he offers to perform in lieu of induction into the Armed Forces. If the local board deems any one of these types of work to be appropriate, it will order the registrant to perform such work, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I-O, unless he had volunteered for such work.

"(b) If the registrant fails to submit to the local board types of work which he offers to perform, or if the local board finds that none of the types of work submitted by the registrant is appropriate, the local board shall submit to the registrant by letter three types of civilian work contributing to the maintenance of the national health, safety, or interest as defined in § 1660.1 which it deems appropriate by the registrant to perform in lieu of induction. The registrant, within ten days after such letter is mailed to him

He filled it in, informing the Board, among other things, that he was willing to perform work for the blind and that he had been interviewed by the New Jersey Distributors of Blind Made Products of East Orange, New Jersey, for a job with that organization. The Board advised him that the New Jersey Distributors of Blind Made Products was not on the list of approved employers but that he could examine such an approved list at the State Headquarters of the Selective Service System, at 1060 Broad Street, Newark, New Jersey.

He later inquired whether the Federation of Jewish Philanthropies of New York was an approved employer and was informed that it was not.

On July 4, 1962, appellant went to work for the New Jersey Goodwill Industries, Inc. He was still employed by it when he received the communication from the Board of August 7, 1962, directing that he report to the office of the Board on August 20 for the purpose of engaging in civilian work at the New Jersey State Hospital at Greystone Park.

Nearly a year elapsed between the time the appellant made known his willingness to engage in civilian employment that contributed to the public welfare and when he actually entered the service of Goodwill Industries, Inc. There he worked as a truck driver out of its place of business in Jersey City. His job was to collect donated articles from receiving stations within a radius of 30 to 40 miles of Jersey City. Although appellant had seen Goodwill Industries listed as an approved agency for which conscientious objectors might work by states other than New Jersey, it had not been approved in this state. Indeed, on August 20, 1962, the very day that appellant was notified to report for work, Goodwill Industries made application to the National, State and local Selective Service authorities for approval. Such approval from the State of New Jersey was not actually granted until September 6, 1962.

█ It is the position of appellant that as a volunteer for civilian work he was free to make a choice of work. He urges that by failing to recognize his "volunteer" status the Board denied him

by the local board, shall file with the board a statement that he either offers to perform one of the types of work submitted by the board, or that he does not offer to perform any of such types of work. If the registrant offers to perform any one of the three types of work, he shall be ordered by the local board to perform such work in lieu of induction, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I-O, unless he has volunteered for such work.

"(c) If the local board and the registrant are unable to agree upon a type of civilian work which should be performed by the registrant in lieu of induction, the State Director of Selective Service for the State in which the local board is located, or the representative of such State Director, appointed by him for the purpose, shall meet with the local board and the registrant and offer his assistance in reaching an agreement. The local board shall mail to the registrant a notice of the time and place of this meeting at least 10 days before the date of the meeting. If agreement is reached

at this meeting, the registrant shall be ordered by the local board to perform work in lieu of induction in accordance with such agreement, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I-O, unless he has volunteered for such work.

"(d) If, after the meeting referred to in paragraph (c) of this section, the local board and the registrant are still unable to agree upon a type of civilian work which should be performed by the registrant in lieu of induction, the local board, with the approval of the Director of Selective Service, shall order the registrant to report for civilian work contributing to the maintenance of the national health, safety, or interest as defined in § 1660.1 which it deems appropriate, but such order shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I-O, unless he has volunteered for such work." 32 C.F.R. § 1660.20 (Jan. 9, 1962).

this advantage and that in any event he should not have been ordered to work pending the approval of Goodwill Industries on September 6, 1962. Upon its approval, he asserts, he should have been permitted to continue his work there as satisfying his obligation to the Selective Service System. Appellant relies on his mere statement in Form No. 15 of his willingness to take on civilian work of national importance as placing the burden upon the Board of sending him an appropriate form upon which he would request to be ordered to perform such work.[25] But the appellant cannot so easily cast this burden upon the Board. It was his duty to obtain the employment that was to be his satisfactory substitute for entering military service. Moreover, that employment, whether voluntarily engaged in by a registrant or chosen for him by the Board, was in any case to be employment considered appropriate by the Board, and not just any employment, private or non-profit, which suited the whim of the registrant.[26]

But here the appellant draws down another objection. Now he appears to concede that approval of the employer is necessary but that it is completely within the discretion of the local board to give that approval. He asserts that the Board utilized lists of employers transmitted to it by the National and State Selective Service authorities and made its order pursuant to the suggestion by them. In this, appellant contends, the Board abandoned its duty to exercise its own discretion which, he submits, excuses him from compliance with the directive of the Board that he take employment with the New Jersey State Hospital at Greystone Park. Indeed, he goes so far as to doubt the constitutionality of the regulation limiting the employers to public or non-profit agencies asserting that those engaged in private enterprises are fully as contributive toward the public welfare as non-profit agencies.

But the appellant makes no suggestion that the proposed employers were unfit. Were this the case and it was shown that the Board permitted its discretion to be dominated by suggestion of employers, illegally contrived, there might have been some ground to his contention. However, when the dust cloud of these objections settles, it becomes apparent that the Board, by permitting itself to be guided in the selection of the proposed employer of this conscientious objector, abandoned none of its autonomy with which the Selective Service Act vested it. Indeed, it is difficult to understand how uniformity of treatment of all conscientious objectors with regard to engagement in public welfare work could otherwise be practiced.

25. A sample of such form, known as Selective Service Form No. 151, admitted in evidence discloses that beyond information identifying the registrant it principally contains the following statement:
"I hereby volunteer for civilian work contributing to the maintenance of the national health, safety or interest, and request that I be ordered to perform this work under the provisions of the Universal Military Training and Service Act, as amended, and the rules and regulations prescribed thereunder. For this purpose I waive all rights of personal appearance and appeal if I am classified as available for such civilian work and I consent to being ordered to perform this work at any time convenient to the Government."

26. The Selective Service Act clearly prescribes that the employment shall be that which the *local board deems appropriate*, when it stated:
" * * * Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, * * * if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be ordered by his local board, subject to such regulations as the President may prescribe, to perform for a period equal to the period prescribed in section 4(b) [section 454(b) of this Appendix] such civilian work contributing to the maintenance of the national health, safety, or interest as the local board *may deem appropriate* * * *."
(Emphasis supplied.) 50 U.S.C. App. § 456(j) (1961).

Appellant further urges the contention that his conviction must be reversed because the Trial Judge refused evidence offered to show that the State Director of Selective Service committed "harmful procedural errors" in not filing an appeal for the appellant from the order of August 7, 1962, directing him to report for civilian work, in not preventing the issuance of such an order, and in failing to reply to questions put by appellant to him concerning the regulations. This revolved around a letter forwarded to the Board and the State Director by the appellant on August 21, 1962, the day following the date on which he was ordered to report, in which he again stressed his application that he be permitted to continue to work for Goodwill Industries. He enclosed a copy of Goodwill Industries application of August 20, 1962, to be listed as an approved employer.

On September 15, 1962, appellant also wrote the State Director that he appealed "from any complaint against me that requires prosecution of me." The pith of appellant's contention is that his communications to the Board and to the State Director constituted an appeal to the Board from its order of August 7 and placed the burden upon the State Director of prosecuting such an appeal. The Trial Court refused to entertain this evidence and the appellant reserved it by way of an offer of proof.

 There can be no merit to the claim of the appellant that his requests concerning his employment with the unapproved Goodwill Industries, after August 7 and August 20, 1962, constituted an appeal to the Board or a burden upon the State Director of prosecuting it. If the State Director did not respond to questions which appellant says he posed to him after he had failed to report as ordered, such failure can hardly be regarded as relevant to the issue upon which appellant was tried, namely, whether he wilfully failed to appear as directed by the Board on August 20, 1962. The Trial Judge correctly rejected the evidence.

 Still another ground apparently seriously urged by the appellant for reversal of his conviction is that notwithstanding his failure to report to the New Jersey State Hospital at Greystone Park on August 20, 1962, he was "constructively" present there. He bases this on his assertion that he visited the Hospital on June 26, 1962, and was interviewed by its personnel officer, who he alleges, promised to notify him when a job was available, which promise the personnel officer denied. Since he never received any notification from the Hospital, he states that his "physical presence there was entirely superfluous and uncalled for." The Trial Judge was fully justified in rejecting this proposition.

 After both sides rested the appellant moved for a directed verdict of acquittal because there had been no proof of compliance with section 1660.30 of the Selective Service Regulations,[27] which requires information of failure to obey an order to report to be forwarded to the National Director of the Selective Service System for his approval of prosecution by the Department of Justice. Failure to comply with the outlined procedure leading to prosecution was not a condition precedent for the finding of an indictment by the Federal Grand Jury of the violation of the law named there-

27. *"Failure or neglect to obey order to perform civilian work.*

"Any registrant who knowingly fails or neglects to obey an order from his local board to perform civilian work contributing to the maintenance of the national health, safety, or interest in lieu of induction shall be deemed to have knowingly failed or neglected to perform a duty required of him under title I of the Universal Military Training and Service Act, as amended. When any registrant fails or neglects to obey any such order, his Cover Sheet (SSS Form No. 101) and contents shall be forwarded to the Director of Selective Service for a determination as to whether or not the registrant shall be reported to the Department of Justice for prosecution." 32 C.F.R. § 1660.30 (1959).

Local Board Memorandum No. 64, par. 10, is in more detail to the same effect.

in. Neither was it a necessary ingredient in the establishment of the Government's case against the appellant. The Trial Judge correctly denied the appellant's motion.

Finally at the hearing of this appeal the appellant challenged the constitutionality of Section 6(j) of the Selective Service Act, 50 U.S.C. App. § 456(j), and the jurisdiction of the Board over him on the authority of United States v. Seeger, 326 F.2d 846 (2 Cir. 1964). There Seeger was denied exemption from I-A military service classification because his conscientious objections to such service were not based upon a "belief in a relation to a Supreme Being." His conviction for failure to report for military service in his I-A classification was reversed on the ground that the statute limiting the conscientious objection to military service to persons who believe in a Supreme Being violated the due process clause of the fifth amendment by creating an impermissible classification as applied to one whose abhorrence of war was sincere and was predicated on religious training and belief. The short answer to this argument is that the *Seeger* case is irrelevant to this one where the appellant was concededly granted his conscientious objector classification by the Board without more than the formal required questions.

The trial of this case consumed more than four days. The record was needlessly prolonged by an interminable range of objections and technicalities offered by both counsel for the Government and for the appellant. Nevertheless the entire record and the charge of the Trial Judge have been reviewed. On this appeal the appellant has raised an almost endless number of challenges to his conviction. Many are repetitiously advanced. We have endeavored to rule upon all that appeared to deserve comment. Upon the others, for example, the Government's failure to prove criminal intent, we found them so lacking in substance as to merit no comment.

We are convinced that the appellant was accorded a fair trial; that the record discloses no erroneous ruling of the Trial Judge that prejudiced the appellant or that warrants reversal and that the charge of the Trial Judge fairly and adequately submitted to the jury the issue of fact which it was called upon to decide. The judgment of conviction is affirmed.