**UNITED STATES of America**

v.

**Ancil Clyde ODOM, Jr.**

**Crim. No. 14626.**

United States District Court,
M. D. Pennsylvania.

June 30, 1972.

S. John Cottone, U. S. Atty., Julius Altman, Asst. U. S. Atty., Scranton, Pa., for plaintiff.

Ambrose R. Campana, Paul W. Reeder, Thomas C. Raup, Williamsport, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, District Judge.

Defendant, a federal prisoner at Lewisburg Penitentiary, was tried by a jury on an indictment charging him with murdering a fellow inmate, Carl J. Jagiello "by means of stabbing him with a

knife, 13" long, made from a piece of steel, tapered to a point and sharpened". After seven days of trial the jury returned a verdict of guilty of murder in the first degree without capital punishment. Defendant has moved for a new trial contending that (a) he has discovered new evidence indicating that an essential government witness committed perjury; (b) government counsel made prejudicial remarks in his summation; (c) prospective jurors were improperly excluded when they indicated that they would not vote to impose the death penalty; (d) inflammatory color photographs of the decedent's corpse were admitted into evidence; and (e) the government attempted to introduce into evidence a statement of defendant without showing that it was made voluntarily.

A summary of the evidence will help put all issues in their proper perspective.

Defendant, Ancil C. Odom, Jr., was originally received at the United States Penitentiary in Marion, Illinois, in November, 1967, for service of a 15-year sentence imposed for bank robbery. On June 4, 1968, he was transferred to the Lewisburg Penitentiary where he remained until January 9, 1969, when he was transferred temporarily to Marion in order to testify as a defense witness at the murder trial of one Joseph R. VanBevers. On February 2, 1969, the decedent, Carl J. Jagiello, was transferred from Marion to Lewisburg and was assigned to Cell No. 221 in D-2 cell block. Subsequently, defendant's service as a witness in Marion was not required as VanBevers entered a plea of guilty and, on February 9, 1969, defendant was returned to Lewisburg and quartered in Cell No. 226 in D-2 cell block.

On February 13, 1969, at approximately 5:40 P.M., after the occupants of D-2 had returned from the Dining Room, defendant was observed going into Jagiello's cell and, shortly thereafter, Jagiello emerged and was seen trying to get away from defendant and another inmate, Bruce Rohrbach, who appeared to be holding him. Inmate Lloyd Harrison testified that Jagiello was backing out of his cell and ". . . was bleeding and holding his hand trying to fight this fellow [defendant] off who had the knife in his hands". (N.T. 228) Continuing, the witness stated that Jagiello fell on his knees and defendant ". . . began knifing while he was on his knees and hit him in the back, and this fellow [Jagiello] let out a loud scream and ran". This testimony was corroborated by inmate Edwin C. Smith who stated that he saw defendant repeatedly make upward motions with the knife and Jagiello, while attempting to resist, slipped and fell on the cell block floor on his chest whereupon defendant pounced on him, switched the knife from his right hand to his left hand, and plunged it into the left shoulder blade of Jagiello's back and blood gushed out "like a geyser". (N.T. 300–302) Both Harrison and Smith saw Jagiello run toward the cell block door with defendant in pursuit. Inmate John Ratkovich testified that he saw defendant "leap and lunge" at Jagiello which was followed by "an agonizing sound, and then shortly thereafter, about a second, Mr. Odom was coming back to his quarters and somebody yelled, 'Get into the shower', and he stepped directly in front of my quarters and I stood there watching him and he has this knife right in his hand in front of my door". (N.T. 173) Jagiello ran down the steps toward the hospital "spewing blood out of his mouth just like somebody opened a water fountain" and collapsed at the hospital door. (N.T. 469) He expired approximately five minutes later. An autopsy was performed by Dr. David M. Mikhail, a pathologist, and it revealed seven stab wounds: five over the interior surface of the trunk, one over the tip of the left shoulder, and one over the left posterior side of the chest. Immediate cause of death was attributed to a stab wound in the heart (the right cardiac ventricle) which had a depth of "anywhere from four to five inches from the point of entry before it entered

the right ventricle." Dr. Mikhail testified that one of the other wounds was inflicted "with what must have been considerable force" because it penetrated the entire ¾" thickness of the breast bone, the sternum. (N.T. 595, 596)

The weapon used was discovered by prison officials in the cell block corridor under a cardboard box and it was described as a piece of steel, 13 inches long, that was sharpened and fashioned into a knife. The handle consisted of tissue paper tightly wound to such an extent that it became a hardened substance.

Defendant did not deny stabbing Jagiello but asserted that he acted in self defense. Defendant stated that Jagiello was known in the prison system as one "who supposedly or allegedly gave a statement pertaining to the killing of a correctional officer in Marion, Illinois . . ." and that Jagiello attempted to speak to him on February 10th but defendant refused to answer informing Jagiello that "it would damage me if anybody seen me talking to you that knew who you were". According to defendant, on February 11 or 12, another inmate, Allen Reed, told defendant that Jagiello had approached him and asked for a knife because "he had to shut me up one way or the other". In addition, defendant contended that inmate Edwin C. Smith was a friend of Jagiello's and told defendant that if he didn't stop telling people that Jagiello was a government witness that they "were going to get on me and shut me up any way they could".[1] Because of this, defendant testified that he went into Jagiello's cell on February 13 "to see if he is threatening me" and that, when he asked about it, Jagiello got "real excited . . . grabbed something off his locker . . . and lunged at me". Defendant stated that, because of his proficiency in karate, his reflexes took over and he kicked Jagiello in the face, turning him sideways, and Jagiello "tried to stab me by lunging behind me". At this point, defendant claimed that he knocked the knife from decedent's hand and when he picked it up "to throw it in the hall", Jagiello grabbed him and "(w)hen he grabbed me, all I was trying to do was get away from him and in the process I stabbed him". According to defendant, the scuffle continued and, in protecting himself, he had to stab decedent several more times. Defendant denied chasing Jagiello down the corridor, but admitting placing the knife under a pasteboard box in the corridor. After doing this, defendant said he returned to his cell, threw his shorts in the commode,[2] lathered his face and began to shave. When two guards appeared and locked his cell door, defendant wiped the lather from his face, picked up his electric guitar and, by his own admission, started playing "The Wildwood Flower".

Defendant's version of acting in self defense was in direct contradiction to the testimony of inmate William Oscar Timms, Jr., who testified that, in January, 1970, he occupied a cell in segregation next to defendant's and that defendant told him that Jagiello was an informer in a case in Marion in which a guard was killed and that defendant was supposed to kill him and, in fact, tried to "get him" several times in the library and in his cell block. Timms quoted defendant as saying that as Jagiello stepped out of the shower, he stabbed him twice, threw him against the wall and stabbed him again and, when Jagiello fell to his knees, his blood "got all over" the defendant who went back to his cell to get rid of his clothes. (N.T. 346) Defendant informed him further that he threw his clothing out the window[3] and washed some of it down the commode.

---

1. Inmates Allen Reed and Joseph R. Van-Bevers corroborated defendant on this point.

2. Defendant testified that he threw his shorts into the commode because he was scared and "wanted to rid myself of any evidence of the crime".

3. A pair of trousers was found in the courtyard near the building line of D cell block opposite the outside window of Cell No. 224.

Defendant denied making these statements to Timms, disclaimed throwing the trousers out the window, and also denied the testimony that Bruce Rohrbach was with him.

Consequently, there was a credibility conflict which the jury resolved against the defendant.

### I. Newly Discovered Evidence that an Essential Government Witness Committed Perjury

Defendant has submitted letters from three federal inmates challenging the validity of the testimony of William Oscar Timms, Jr. One of them, Doyle S. Royal, an inmate at Marion, claims that, while in the Federal Penitentiary in Atlanta, Timms told Royal that he had no real knowledge of the incident, except by rumor and hearsay, and volunteered to testify in the hope of being able to escape while enroute to Lewisburg or of being treated favorably by the Parole Board. Jerry R. James stated that in Atlanta Timms told him that the F.B.I. offered him a cut in his sentence or a parole if he would commit perjury for the government. James complained further that he would testify for Odom only if guaranteed physical safety from prison and court officials asserting that he testified recently in federal court in Marion and was placed in segregation ". . . and told that I would spend the rest of my sentence in the hole if this ever happened again". Finally, the letter of Juan D. Mejilliar stated that while Timms was in "the nut ward" at Atlanta he told Mejilliar that he knew nothing about the case except what was told to him by the police but that if he didn't testify ". . . they are going to kill me".

Motions for new trials on the ground of newly discovered evidence are not favored by the courts and are viewed with great caution. United States v. Lombardozzi, 343 F.2d 127, 128 (2d Cir. 1965), certiorari denied 381 U. S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702.

The general rule is that newly discovered evidence merely impeaching the credibility of a government witness is insufficient to justify a new trial. United States v. Kozak, 438 F.2d 1062, 1067 (3d Cir. 1971). In this case, Timms was extensively cross-examined as to his mental condition; his relationship with defendant; and whether he expected favorable treatment as a result of his testimony. Although his testimony was important in contradicting defendant's claim of self defense, there was more than ample evidence from eyewitnesses to the effect that defendant was the aggressor; that he inflicted severe stab wounds on the decedent; that he plunged the knife into Jagiello's back while he was lying prone, on his chest, in the cell block corridor; that he pursued Jagiello down the corridor after stabbing him; that he destroyed evidence of his involvement in the crime; and that, after participating in this bloody encounter, calmly played his guitar, remembering even now that the tune he played was "The Wildwood Flower". Hardly the conduct of a man who was unexpectedly thrust into a fierce battle in defense of his own life. One of the tests for the grant of a new trial is whether the newly discovered evidence would probably lead to an acquittal on retrial. United States v. Cousins, 429 F.2d 1271, 1272 (9th Cir. 1970). As trial judge, I can foresee no such result as the evidence adduced at the trial, even excluding that of Timms, pointed overwhelmingly to guilt of first degree murder. It gave every appearance of a cold-blooded, brutal, and senseless act which could justifiably lead a jury to a verdict of murder in the first degree.

Moreover, the letters submitted by defendant, not in affidavit form, are not persuasive and, in some respects, are inherently incredible. See United States v. Alexander, 139 U.S.App.D.C. 163, 430 F.2d 904, 906 (1970). I am satisfied that this type of impeachment testimony would not lead to an acquittal on retrial.

## II. *Prejudicial Remarks in the Summation of Government Counsel*

During the closing argument of governmental counsel, the defense objected to his reference to custodial officer witnesses as "not convicted criminals . . . paid and trained by you, the taxpayers" and as "brave men". The objection was sustained, the court commenting that such descriptions had no bearing on their credibility. The following day, immediately prior to the court's charge to the jury, defense counsel moved for a mistrial on the ground that government counsel had made reference to the witness Timms as a brave man who, by testifying, subjected himself to the possibility of being killed. The motion was denied and the court asked defense counsel if cautionary instructions were desired, to which a negative reply was received. At oral argument on this motion, defense counsel now complains for the first time that in government counsel's closing argument he expressed a personal belief in the defendant's guilt; that he expressed a personal opinion on defendant's credibility; and that he made emotional references to the "bloody" photographs of decedent.

 An absence of objection to the remarks at the time of their utterance weighs heavily in the determination that they were not actually prejudicial. United States v. Lawson, 337 F.2d 800, 807 (3d Cir. 1964). Counsel is not entitled to lie low, say nothing and to bring up this fleeting argument months afterward as a basis for reversal. United States v. Kravitz, 281 F.2d 581, 587 (3d Cir. 1960). Moreover, a fair reading of the transcript reveals that government counsel's remarks cannot be considered as an expression of his personal opinion of defendant's guilt. At the very most his remarks fairly construed refer only to belief based on the evidence and not to an opinion formed from facts not in evidence. United States v. Schartner, 426 F.2d 470 (3d Cir. 1970). The remaining statements of which defendant complains were not prejudicial to his case. In the heat of dispute, some latitude must be given to lawyer's language, United States v. Lawson, *supra*, so long as he strikes hard blows and not foul ones. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). I think his comments were fair under the circumstances and, in light of all the evidence, if error at all, it would be harmless.

## III. *The Exclusion for Cause of Prospective Jurors Who Indicated That They Would Not Vote to Impose the Death Penalty*

 This argument is predicated on the granting of the government's challenges for cause of certain jurors who stated that they would automatically vote against the imposition of the death sentence no matter what the evidence at the trial would reveal. (N.T. 92–96) It should be apparent that defendant has no cause for complaint as the jury did not impose the death penalty. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In any event, the exclusion of the jurors fully complied with the guidelines set down by the Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1967) and, consequently, defendant's argument is without merit.

## IV. *It was Reversible Error to Admit Color Photographs of the Decedent's Corpse*

 The photographs received in evidence in the government's case in chief depicted the stab wounds which led to death. As such they had probative value not only to illustrate the medical testimony on the cause of death but also as corroboration of the government's eyewitnesses. In addition, they had some bearing on the evaluation of defendant's testimony that he merely acted in self-defense while resisting decedent's attack. Photographs of the body are admissible so long as they have some probative value and are not intended solely to inflame the jury. Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d

281, 287 (1967). The admission or rejection of photographs lies largely in the sound discretion of the trial court. Maxwell v. United States, 368 F.2d 735, 739 (9th Cir. 1966). See also Comm. v. Clanton, 395 Pa. 521, 525, 151 A.2d 88 (1959). The mere fact that the photographs were in color did not transform them into gruesome and unsightly exhibits. In sum, I conclude that the photographs were not introduced to inflame the jury and, moreover, were not so provocative as to arouse passion and resentment against the defendant in the minds of the jury.

V. *The Attempt by Government Counsel to Introduce into Evidence a Statement of Defendant Without Showing that it was Made Voluntarily*

 It would appear that defendant made oral statements to government investigators shortly after the incident occurred. At the trial, there was no attempt to introduce these statements on the government's side of the case. However, while defendant was undergoing cross-examination, he was asked whether he had been interviewed by Agents of the Federal Bureau of Investigation; whether they had advised him of his rights; and whether they had questioned him concerning his involvement in the case.[4] This line of questioning was interrupted by the court and counsel were called to side bar. Government counsel indicated that he was attempting to lay the groundwork for rebuttal testimony because defendant had denied making any statement but the court directed him to cease this inquiry and there was no further reference to it.

 Defense counsel now contends that the effect of this limited interrogation "was to raise in the minds of the jury the inference that the defendant had made an incriminating statement which was inadmissible for 'technical reasons'". This contention requires but

a brief answer: (1) it cannot be reasonably argued that such an inference was raised; (2) the matter was first introduced into the case by defendant; (3) no objection was made by defense counsel; (4) the questioning was terminated by the court on its own initiative; and (5) the defendant received an undeserved benefit from the court's ruling inasmuch as the United States Supreme Court subsequently held in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L Ed.2d 1 (1970) that an accused's credibility may be appropriately impeached by use of an earlier conflicting statement even though it was inadmissible to establish the prosecution's case in chief under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As in Harris there is no claim made here that the statements were coerced or involuntary.

Accordingly, defendant's motion for a new trial will be denied.

---

4. Defendant had testified on direct examination that he had been interviewed by F.B.I. Agents and asked to sign a waiver of his rights which he refused.