**UNITED STATES of America**

v.

**Richard DABNEY et al.**

**Cr. No. 73–471.**

United States District Court,
E. D. Pennsylvania.

March 6, 1975.

Memorandum and Order March 31, 1975.

Jeffrey M. Miller, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Ronald McCaskill, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

FOGEL, District Judge.

On May 31, 1974, Richard Dabney was found guilty by a jury on four counts charging him with conspiracy, 18 U.S.C. § 371, and violation of the federal bank robbery statute, 18 U.S.C. § 2113. his counsel has filed alternative motions which seek the following relief: (1) dismissal of the indictment based upon excessive pretrial delay, (2) arrest of judgment under Rule 34 of the Federal Rules of Criminal Procedure, or (3) a new trial, under Rule 33 of the Federal Rules of Criminal Procedure.

We have considered these motions in light of the entire record, including all pretrial, trial and post-trial motions which have been raised by defendant; we conclude that they should be denied, and that the verdict of the jury should stand. Our reasons for doing so follow.

I. *Pretrial delay*

We considered Dabney's motion to dismiss the indictment on the grounds of prejudicial pretrial delay on May 13 and 14, 1974, before the jury was sworn. Testimony was adduced from the following persons: *First*, Dabney (N.T. 1–75 to 1–97; 1–101 to 1–112; 1–120 to 1–121), (after an extensive warning to him of his rights under the Fifth Amendment [N.T. 1–75]), *Second*, Special Agent Larry E. Doss of the Federal Bureau of Investigation (N.T. 1–98 to 1–100; 1–122 to 1–148; 1–162 to 1–164) and, *Third*, Ernest Kelly, Sr. (N.T. 1–148 to 1–162). We rendered an oral decision of record which included a complete statement of the findings of fact and the conclusions of law in support of our holding (N.T. 2–4 to 2–17). Our subsequent review of the record in the case, with respect to the matters that are now before us, reconfirms our conviction that the initial denial of the motion to dismiss the indictment was correct.

The factual foundation for the legal conclusions which led to that decision, arises from the following sequence of events pertinent to Dabney's speedy trial motion.

1. On February 8, 1973, Dabney was arrested at or near the Continental Bank, Broad and Nedro Streets, Philadelphia, on state charges arising out of an incident involving Ernest Kelly, Sr., and members of his family, which had taken place earlier that day (N.T. 1–52). The state charges included aggravated robbery, kidnapping, conspiracy, burglary, receiving stolen goods, and violation of the uniform firearms act.

2. In the latter part of February, 1973, after a period of incarceration of approximately two weeks, Dabney posted bail on the state charges (N.T. 1–52).

3. In July of 1973, Thomas Clinton died, apparently of natural causes (N.T. 1–98). Clinton was named as an unindicted co-conspirator, deceased, in the federal indictment in this case. Dabney claimed, at the hearing on May 13, 1973, that Clinton would have appeared as a witness in his favor (N.T. 1–88, 1–104 to 1–109).

4. On August 24, 1973, the indictment in the instant case was filed.[1]

5. On the evening of August 29, 1973, Dabney was arrested and interviewed by agents of the Federal Bureau of Investigation (N.T. 1–122 to 1–148).

6. The following day, August 30, 1973, Dabney posted bail on his own recognizance in the amount of $35,000.

7. On September 6, 1973, Dabney was arraigned and pleaded not guilty to all counts of the indictment charging him with violations of 18 U.S.C. §§ 2113, 371, and 924(c)(2). He was represented at this arraignment by Edward H. Weis, Esq., of the Federal Court Division of the Defender Association of Philadelphia.

8. On September 25, 1973, Jeffrey Miller, Esq., who has been the Assistant United States Attorney in charge of prosecuting the federal indictments, wrote to Herbert K. Fisher, Esq., counsel for John W. Clark, a co-defendant, and suggested the possibility of a conflict on Fisher's part, because Dabney was represented in another criminal action in the Court by Herman Bloom, Esq., a partner of Mr. Fisher.

9. On September 28, 1973, Edward H. Weis, Esq. advised the Court in writing of the representation of John W. Clark by the Defender Association of Philadelphia in another unrelated matter which was the subject of a petition brought on Clark's behalf under 28 U.S.C. § 2255.

10. On October 3, 1973, Jeffrey Miller, Esq., advised us in writing of the arrest of William Christian and John Griffin, co-defendants in this case, by the Federal Bureau of Investigation in Jacksonville, Florida.

11. On that same date, Edward Weis, Esq. wrote to the Court requesting a continuance of the trial from October 29, 1973, when it was originally scheduled, until a date after November 12, 1973, because of Weis' impending marriage and wedding trip.

12. On October 5, 1973, the Court appointed Nicholas J. Nastasi, Esq., to replace Weis as Dabney's counsel.

13. On October 16, 1973, Nastasi wrote to John Harding, Esq., Clerk of the District Court, declining the appointment.

14. On October 23, 1973, we then appointed Robert Baer Cohen, Esq. to replace Nastasi as Dabney's counsel.

15. On October 26, 1973, Cohen wrote to the Court as follows:

"Richard Dabney has called me to advise that he has retained private counsel.

"He tells me that Nino Tinari, Esq. will be representing him and I am therefore returning the appointment unsigned."

---

1. In our oral findings on May 14, 1974, the date of the indictment was inadvertently stated to be August 14, 1973 (N.T. 2–5).

This letter was our first notice of retention of private counsel by Dabney.

16. On October 30, 1973, Judge Hannum, of this Court, sentenced Dabney to a period of study under 18 U.S.C. § 4208(b) and (c), and ordered the results of that study to be furnished to the Court within three months, or within such further period of time, not to exceed an additional three months, as the Court thereafter ordered. At the time of sentencing, Jeffrey Miller, Esq. stated to Judge Hannum that the instant case, involving the incident of February 8, 1973, was "far away from trial" (United States v. Dabney, Crim. No. 73–195, October 30, 1973, N.T. 11).[2]

17. In December of 1973, Lonny Anderson died (N.T. 1–89).[3] Dabney testified that Anderson would have given exculpatory testimony with respect to the incident of February 8, 1973 (N.T. 1–109 to 1–111).

18. On January 2, 1974, we signed an Order specially listing the matter for trial on February 19, 1974.

19. On February 19, 1974, Judge Hannum sentenced Dabney in Crim. No. 73–195 to three years imprisonment followed by a special parole term of two years.

20. On February 19, 1974, trial of this case began. Dabney complained of problems with his back, which allegedly made it difficult, or impossible for him to continue to participate in his defense. A medical examination was conducted by a Court-appointed orthopedist, Dr. Jerome M. Cotler of Jefferson Orthopaedic Associates, Philadelphia. Even though Dr. Cotler testified that Dabney was able to stand trial and to participate in his defense (N.T. 2–16 to 2–19), the Court granted a mistrial at Dabney's request, and ordered a period of study at the Medical Center for Federal Prisoners, Springfield, Missouri. Dabney expressly waived any double jeopardy claim in connection with the grant of the mistrial (N.T. 2–23 to 2–30; the waiver form was filed February 20, 1974). A new trial was specially listed for May 13, 1974. Dabney's bail was revoked at that time.

21. On March 29, 1974, Dabney submitted a *pro se* petition, based on the Sixth Amendment and Rule 48(b) of the Federal Rules of Criminal Procedure.[4] *This petition was the first assertion by or on behalf of Dabney of a right to a speedy trial.*

22. On April 16, 1974, a report was sent to this Court from Dr. Jack Eardley of the Medical Center for Federal Prisoners. The report stated that Dabney was competent and able to stand trial.

23. On May 13, 1974, trial began. A hearing was held on Dabney's speedy trial claims.

This is the factual framework which has led us to conclude, as per our discussion of the legal issues which follows, that Dabney's motion lacks merit, and that our original findings and conclusions on this score should be reaffirmed. In accordance with the relevant case law in this area, we will discuss, *seriatim*, the alleged delay *before* and *after* the date of indictment.

### 1. Pre-indictment delay

██ The Sixth Amendment right to a speedy trial does not attach prior to *in-*

---

2. In our Findings of record on May 14, 1974, we stated that the sentencing before Judge Hannum took place on October 26, 1973. The October 26th date was supplied by Dabney (N.T. 1–79), without objection from the Assistant United States Attorney. A review of the records in Crim. No. 73–195, however, establishes that the correct date of sentencing was October 30, 1973.

3. In the same Findings of record on that date, we also stated that Anderson died in October or November of 1973 (N.T. 2–5). However, for the purpose of this motion, and in accordance with the testimony of Dabney, we will assume that Anderson died in December of 1973, after the scheduled trial date of October 29, 1973, and before trial began on February 19, 1974, an assumption which is most favorable to the defendant.

4. In this Court's Findings delivered of record on May 14, 1974, this date was inadvertently stated to be March 19, 1974.

*dictment* or *arrest,* United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Similarly, the provisions of Rule 48(b) of the Federal Rules of Criminal Procedure are clearly limited to post-arrest situations, United States v. Marion, *supra,* 404 U.S. at 319, 92 S.Ct. 455, 30 L.Ed.2d 468, United States v. Dukow, 453 F.2d 1328 (3d Cir. 1972), cert. den. 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331.

▇ Nor does an arrest by police on state charges, under the circumstances presented in this case, trigger any Sixth Amendment rights with respect to federal charges which may follow. As the Court said in United States v. DeTienne, 468 F.2d 151, 155 (7th Cir. 1972), "[i]t would be absurd in the extreme if an arrest on one charge triggered the Sixth Amendment's speedy trial protection as to prosecutions for any other chargeable offenses."[5] Similarly, an arrest on state charges does not bring into play the provisions of Rule 48(b), (Federal Rules of Criminal Procedure), which provide for dismissal "[i]f there is unnecessary delay in presenting the charge to the grand jury or in filing an information *against a defendant who has been held to answer to the district court*" (emphasis added).

It is clear, therefore, that Dabney can have no tenable claims based upon the Sixth Amendment, or upon Rule 48(b), for the period from February 8, 1973, the date of his arrest by the Philadelphia police, until August 24, 1973, the date of the federal indictment.

▇ United States v. Marion, however, does permit a claim based upon the Due Process clause of the Fifth Amendment for the pre-indictment period, even though it forecloses the assertion of rights under the Sixth Amendment and Rule 48(b). *Id.,* 404 U.S. at 324, 92 S. Ct. at 465 (footnote omitted):

> * * * it is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. Cf. Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963); Napue v. Illinois, 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959). * * *

While it is not entirely clear from the Court's opinion in United States v. Marion whether *both* "substantial prejudice" *and* "an intentional device to gain tactical advantage over the accused" must be shown to make out a due process violation, the Court of Appeals for the Third Circuit, in United States v. Dukow, *supra,* 453 F.2d at 1330, has apparently construed this requirement in the disjunctive. Since there is not a scintilla of evidence in this record to establish that the federal indictment was delayed for tactical advantage, in order to warrant dismissal of the indictment we must find substantial prejudice to Dabney's right to a fair trial.

---

5. The Court in *DeTienne* stated that "if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy trial provision's applicability as to prosecution for all the interrelated offenses." *Id.* at 155. In the instant case, the state charges against Dabney included aggravated robbery, kidnapping, conspiracy, burglary, receiving stolen goods, and violation of the uniform firearms act. These crimes could clearly be completed by acts which took place at or near the Kelly's home, and are thus independent of the federal bank robbery offense charged in the instant indictment.

■ We find no due process violation under the standard of *Marion* and *Dukow*, for the following reasons:

*First,* at the time of Clinton's death, only five months had elapsed since the events of February 8, 1973. The government simply could not be accused of inordinate delay at this point. See United States v. Anderson, 471 F.2d 201, 203 (5th Cir. 1973).

*Second,* Clinton could not have been compelled to testify at all in these proceedings, had he chosen to assert his Fifth Amendment right against self-incrimination. See United States v. Lane, 465 F.2d 408, 412 (5th Cir. 1972). Indeed, it is clear that he was named as an unindicted co-conspirator and not a co-defendant only because of his death prior to the federal indictment. Even if Clinton had not been named in the federal indictment, he could have claimed his Fifth Amendment rights with respect to possible state prosecution or, indeed, for any other reason if, in fact, the testimony sought could have incriminated him.

*Third,* there is no evidence, other than Dabney's obviously self-serving statement at the hearing on May 13, 1974, (N.T. 1–105), of any agreement on the part of Clinton to waive his Fifth Amendment rights and to testify on Dabney's behalf. See United States v. Lane, *supra,* 465 F.2d at 412. Moreover, there is no independent evidence at all that Clinton could, or would have exculpated Dabney. There are no statements of Clinton in the possession of Dabney (N.T. 1–106), his counsel, or the government (N.T. 1–138), nor, apparently, was there any effort on the part of Dabney to procure such statements by affidavit, or otherwise (N.T. 1–106), when Clinton was alive—a period of five months, as noted, after Dabney knew he was charged with commission of multiple crimes by the state authorities.

Under all of these circumstances, we are unable to find that Dabney has suffered "substantial prejudice" to his right to a fair trial. Indeed, we find his testimony to be completely lacking in substance and utterly unconvincing.

2. *Post-indictment delay*

■ In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court established four guidelines which control the determination of speedy trial motions: (1) length of the alleged period of delay, (2) defendant's assertion of the right, (3) reason for the delay, and (4) prejudice to the defendant. We shall discuss these factors separately.

(1) *Length of the delay.* The total delay from the date of the indictment until the beginning of trial on May 13, 1974, was less than nine months. The delay from indictment until the February 19, 1974 trial date, *after which a mistrial was granted at defendant's request, was approximately six months.* Had defendant not moved for the mistrial, the case would have proceeded to disposition on February 19, 1974, and *would not* have been continued until May of 1974.

(2) *The defendant's assertion of the right.* Dabney first asserted his right to a speedy trial in a petition filed on March 29, 1974, approximately seven months after the indictment, five weeks *after* his first trial was aborted at his request, and six weeks before the commencement of his second trial.

(3) *The reason for the delay.* The initial continuance from the October 29, 1973, trial date came at the request of Edward Weis, Esq., then counsel of record for Dabney. After Weis' conflict was discovered, we attempted to appoint substitute counsel, but it was not until October 26, 1973, that we learned that Nino Tinari, Esq. had been retained by Dabney to represent him. Mr. Tinari never filed a formal appearance in this case, and was not aware that trial had been scheduled before us in October (N.T. 1–71). Tinari never appeared in this matter before the February 19, 1974, trial date (N.T. 1–67), nor did he re-

quest that the case be listed for an earlier trial.

It is true that the government desired to have all four defendants tried together, to avoid multiple proceedings. On October 3, 1973, Jeffrey Miller, Esq. notified the Court that Christian and Griffin had been arrested in Florida, and, in a Memorandum to Chief Judge Lord dated January 28, 1974, we stated that one reason for the continuance from October 29, 1973, was grounded upon the government's desire to try all four defendants in the same proceeding, if possible. Further, Miller stated to Judge Hannum on October 30, 1973, that the instant case was "far away from trial", based upon the fact that the two co-defendants had been arrested in Florida, and apparently were not then within the jurisdiction.

In summary, therefore, it is clear that neither the defendant nor the government was prepared to go forward on October 29, 1973, nor for some time thereafter.

On January 2, 1974, the Court issued an order specially listing this trial for February 19, 1974, and requiring submission of requests for jury instructions and trial briefs by February 12, 1974. Copies of this Order were mailed to Mr. Tinari and to Dabney. Neither objected to the February 19, 1974 trial date, nor raised any speedy trial motion.

The delay from February 20, 1974, until May 13, 1974, was caused by Dabney's assertion that problems with his back made it difficult or impossible for him to proceed with trial. A mistrial was granted at his request; he was thereafter committed to the Medical Center for Federal Prisoners for study and treatment, if required. The May 13, 1974 Special Listing was ordered in the presence of Mr. Tinari and Dabney, without objection by either of them (N. T. 2–31).[6]

It is clear, therefore, that the government was not responsible for the continuance from February 20, 1974, until May 13, 1974, and in fact opposed the granting of a mistrial and the resultant necessity to delay the trial (N.T. 1–47, 2–2).

■ (4) *Prejudice to the defendant.* Among the factors to be considered in weighing possible prejudice to the defendant are oppressive pretrial incarceration, anxiety and concern, and impairment to the defense, Barker v. Wingo, *supra*, 407 U.S. at 532–533, 92 S.Ct. 2182, 33 L.Ed.2d 101. None of these factors is sufficiently substantial in the instant case to require dismissal of the indictment.

Oppressive pretrial incarceration is clearly not a factor in the instant case. Dabney's two-week incarceration in February of 1973 was on state charges, and not grounded upon the federal indictment before us. Dabney made bail immediately on the federal charges. Judge Hannum sentenced him in Criminal No. 73–195 on February 19, 1974. Bail was revoked in the instant case on February 20, 1974, and thus had no effect with respect to continued incarceration which had already been imposed by Judge Hannum.

Anxiety is not a real factor in this case. The report from Springfield established that while Dabney claimed to be depressed, he was without mental disease or defect, and competent in all respects to stand trial. Dabney's depression could have arisen from the imprisonment imposed by Judge Hannum, adjustment to prison discipline, the necessity of separation from his family, and similar factors. Clearly, no one beset with the myriad problems he faced would be euphoric.

With respect to impairment of the defense, Dabney's primary claim is that the death of Lonny Anderson, in December of 1973,[7] subsequent to the original

---

6. On March 29, 1974, Dabney did petition for a speedy trial under the Sixth Amendment and Rule 48(b).

7. See note 3, *supra.*

trial date of October 29, 1973, deprived him of a witness who could have testified in his behalf.[8] In essence, Dabney claims that Lonny Anderson would have testified that Ernest Kelly, Sr. told Anderson that Dabney had nothing to do with the offenses charged, but that Kelly was pressured by the federal government to testify against Dabney, because Kelly was afraid of prosecution for alleged involvement in drugs and illegal lotteries (N.T. 1–102, 103; 1–109, 110).

We do not find this contention sufficiently substantial under the standard of Barker v. Wingo to warrant dismissal of the indictment in this case, for the following reasons:

*First*: There is absolutely no independent evidence in this record to establish that Lonny Anderson possessed any information—exculpatory or otherwise—about the events in question in this case. We have only Dabney's unsubstantiated testimony. Dabney made no effort to secure a statement or an affidavit from Anderson during the three or four month period from the federal indictment until Anderson's death in December (N.T. 1–110). Dabney's own testimony is obviously self-serving, uncorroborated, and inherently implausible. He has every motive to fabricate such a story to attempt to force dismissal of the indictment. Further, his prior felony conviction is admissible to impeach his credibility under the rule of United States v. Remco, 388 F.2d 783 (3d Cir. 1968), and is certainly a factor to be considered by the Court in assessing the truth or falsity of his testimony.

*Second*: Dabney's testimony is contradicted by that of Ernest Kelly, Sr., who testified that he did not recognize the name Lonny Anderson (N.T. 1–148, 1–150, 1–156, 1–157), and that he was not pressured, induced, coerced, or threatened by the government to give his testimony (N.T. 1–148 to 1–158). He stated unequivocally that the only reason for his coming forward was to seek the conviction of those persons who perpetrated the acts which are at the heart of this criminal indictment (N.T. 1–150).

*Third*: Dabney's testimony is contradicted by that of Agent Doss, who stated that while he knew Lonny Anderson from prior contacts in connection with law enforcement matters, he did not know Anderson in connection with any of the events or defendants involved in the instant case (N.T. 1–130), and that he had never exerted or had any knowledge of pressure, threats, or inducements to Kelly to testify against Dabney (N.T. 1–162 to 1–164). Further, Assistant United States Attorney Jeffrey Miller, who directed the federal prosecution of this case, represented to the Court that there was never any pressure, threat, or coercion directed at Kelly, and that Kelly was anxious to testify because of the over-all conduct of the defendants in this matter and, in particular, their actions as they related to his grandchildren.

*Fourth*: While not in itself determinative, it is significant that Anderson's death occurred in December of 1973, some three months prior to Dabney's first assertion of a right to a speedy trial.

In summary, therefore, it appears from the record that the event of Lonny Anderson's death suddenly allowed Dabney to produce the loom upon which this flimsy fabric has been woven. As the

---

**8.** Dabney also claimed that there were "four or five" witnesses who were unavailable to him due to the delay in trial (N.T. 1–91). Upon questioning by the Court, however, he conceded that there was "nothing definite" in this assertion:

BY THE COURT:

Q. You said before there may be some other witnesses, but you can't remember who they were; is that right?

A. Sir, it is not that I remember. I have witness—like I said, you know how people don't want to be in Court—not that they don't want to come. But I am not sure they told them directly or exactly—I don't have all of the facts. What I would be bringing to Court would be one person telling another person; nothing definite. That is why I am hesitating to say. (N.T. 1–111)

Court noted in United States v. Research Foundation, 155 F.Supp. 650, 655 (S.D.N.Y.1957):

> * * * this move to dismiss the indictment may perhaps be regarded as a post mortem alibi. It is based on the alleged facts that all of the defense witnesses have died or are missing * * *. There is some basis for believing that, by thus casting deceased persons in exculpatory roles, defendants hope to snatch a defense out of the jaws of death. The tactical theory behind this apparent manoeuvre is familiar: dead men tell no tales.

We have carefully examined all of the defendant's contentions against the background of the four factors stressed by the Court in Barker v. Wingo, 407 U.S. at 533, 92 S.Ct. at 2193 (footnote omitted):

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

We have undertaken such a balancing process, mindful of the fundamental right of a defendant to a speedy trial. We have concluded that Dabney was not denied a speedy trial,—nor, for the reasons stated *infra*, was he denied due process or any rights under Rule 48(b) —and we will accordingly affirm our earlier denial of the petition to dismiss the indictment.

## II. *Motion in Arrest of Judgment*

Dabney argues next that this Court was without jurisdiction, because he had previously been indicted on April 24, 1973, by a grand jury of the Commonwealth of Pennsylvania on charges which arose out of the events of February 8, 1973; he argues, therefore, that arrest of judgment should be granted pursuant to Rule 34 of the Federal Rules of Criminal Procedure.

We understand Dabney's contention to be that the pre-existing state indictment strips this Court of jurisdiction over the federal offenses charged in the indictments in the case at bar. In support of this novel theory, he cites only Taylor v. Taintor, 16 Wall. 366, 21 L.Ed. 287 (1873), which is clearly inapposite.

We need not belabor this point. We note that the doctrine of dual sovereignty, although frequently criticized, unquestionably is the law, at least since the decision of the Supreme Court in United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922):

> [A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.

See also Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), and Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

Accordingly, the motion in arrest of judgment, which is based solely on this ground, will be denied.

## III. *Motion for a New Trial*

Dabney asserts the following grounds in support of his final motion in the alternative, the one in which he seeks a new trial.

(1) The verdict was against the weight of the evidence, and unsupported by substantial evidence.

(2) The Court erred in denying Dabney's motion for acquittal at the conclusion of the evidence.

(3) Dabney was denied a fair trial by the prosecutor's statements in both

the opening and closing arguments to the jury.

(4) The Court erred in admitting testimony concerning the actions and statements of alleged co-conspirators.

(5) The Court erred in not granting a mistrial because of the conviction of Clark, Christian, and Griffin on murder charges in the District of Columbia.

(6) The finding of guilt on both Counts II and IV was contrary to law.

(7) The government improperly argued the dismissed firearms counts to the jury in its closing argument.

(8) The posture of Nino Tinari, Esq., who first served as defense counsel for Dabney, prejudiced Dabney before the jury.

(9) The trial was unfair because there was a substitution of counsel without selection of a new jury.

We will discuss these contentions individually.

1. *Sufficiency of the evidence to support the jury's verdict.*

Dabney asserts that the verdict of the jury was both against the weight of the evidence and unsupported by substantial evidence.

[10] While the standard found in Rule 33 of the Federal Rules of Criminal Procedure is simply "if required in the interest of justice", the federal courts have generally agreed that a motion for a new trial is directed to the sound discretion of the trial court. The law is summarized in United States v. Leach, 427 F.2d 1107, 1111 (1st Cir. 1970), cert. den. 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59:

> Motions for new trial are directed to the trial court's discretion. Under its broad power, the court may weigh the evidence and consider the credibility of the witnesses. The remedy is sparingly used, the courts usually couching their decisions in terms of "exceptional cases," United States v. Pepe, 209 F.Supp. 592, 595 (D.Del. 1962), affirmed, 339 F.2d 264 (3d Cir.

1964), "miscarriage of justice," United States v. Parelius, 83 F.Supp. 617, 618 (D.Haw.1949), and where "the evidence preponderates heavily against the verdict," United States v. Robinson, 71 F.Supp. 9, 10–11 (D.D.C. 1947). Rule 33 itself provides that the court may grant a new trial where required "in the interest of justice."

\* \* \*

We have thoroughly scrutinized all of the evidence presented in this case, (which turned out to be government testimony exclusively), and we have concluded that the evidence of guilt was overwhelming. We therefore decline to grant a new trial on the ground first asserted.

Mrs. Kelly testified about the incidents which occurred at her home on February 8, 1973. She identified Dabney (N.T. 2–56), and although her identification was based upon a relatively short period of observation on the day in question, she had previously seen Dabney at her son's bar (N.T. 2–57). We find her testimony credible and corroborative of other witnesses for the prosecution.

Ernest Kelly, Sr. also testified with respect to the incidents which occurred at his home, and positively identified Dabney (N.T. 2–152), whom he had seen ten to twelve times during the year preceding February 8, 1973 (N.T. 2–148, 149). Kelly also testified that Dabney accompanied him to the bank (N.T. 2–167), and that he hit Dabney and escaped from the lobby of the bank (N.T. 2–174, 2–175). Kelly was cross-examined intensively by counsel for Dabney, and his testimony was unshaken.

Bank security guard Edward Scoblow testified to the events at the bank, even though he was unable to identify Dabney (N.T. 8–32, 8–33).

Officer John W. Thomas testified to the events at the bank. He knew Ernest Kelly because he had seen him on numerous prior occasions (N.T. 8–64). He identified Dabney (N.T. 8–71), and said that he had pursued Dabney when he

fled from the bank (N.T. 8–74); in fact, he is the person who apprehended Dabney and turned him over to the police (N.T. 8–77). Officer Thomas' testimony was thoroughly credible.

Additional corroborative testimony was furnished by Sgt. Spangler, Patrolman Flint, Officer McNamee, Officer Cunningham, and Mrs. Corkle.

 It is clear, on the basis of the entire record, that the verdict of the jury was overwhelmingly supported by the quantum of clear and substantial evidence which satisfies the criteria mandated by federal law. United States v. Leach, *supra*. A new trial on this ground is not warranted.

2. *The denial of the motion for a judgment of acquittal at the conclusion of the evidence.*

Before the case was submitted to the jury, Dabney moved for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure. We denied the motion with respect to Counts I (except for overt act number seven, which was deleted), II, IV, and VIII; we granted it with respect to Counts VI and X (N.T. 9–129).

The motion for a judgment of acquittal was renewed the following day, again, at a time which preceded submission of the case to the jury. We confirmed our previous action, and denied the motion with respect to Counts I (except the deleted overt act), II, IV, and VIII (N.T. 10–7).

The motion for a judgment of acquittal was not renewed after the verdict, under Rule 29(c), although we informed counsel for Dabney that such a motion could be so renewed (N.T. 10–113).

Thus, his argument that the Court erred in denying his motion for a judgment of acquittal at the conclusion of the evidence, is before us within the framework of his motion for a new trial, pursuant to Rule 33, and not as part of a post-verdict motion for a judgment of acquittal, under Rule 29(c). Accordingly, we will consider his conten-

tion in light of the standards enumerated in United States v. Leach, *supra*, in contrast to the more exacting standard of a motion for a judgment of acquittal.

In applying the standard of United States v. Leach to the facts, we conclude that the evidence of guilt was overwhelming; therefore the motion for a new trial on this ground will be denied.

 Even though procedurally we are not required to do so, we shall consider this contention—although formally presented as part of a motion for a new trial—as a *de facto* motion for a judgment of acquittal under Rule 29(c). However, Dabney must satisfy a standard that is even higher than that imposed under Rule 33. The criteria for submission of the case to the jury require us to construe the evidence in a light that is most favorable to the government, United States v. Robinson, 71 F.Supp. 9, 10–11 (D.D.C.1947); (this test precludes assessment of the credibility of government witnesses, United States v. Morris, 308 F.Supp. 1348, 1351 [E.D.Pa.1970]). We next must determine whether all of the evidence against the defendant, taken in its totality, rises to a level which would permit reasonable jurymen to find the defendant guilty beyond a reasonable doubt, United States v. Sutton, 138 U.S. App.D.C. 208, 426 F.2d 1202, 1210 (1969); United States v. Allard, 240 F. 2d 840, 841 (3d Cir. 1957). If it does, a motion for a judgment of acquittal must be denied. The standard is the same, whether the motion is made before or after the verdict; United States v. Sutton, *supra*, 426, F.2d at 1210.

In light of these precepts, we find that the jury verdict of Dabney's guilt beyond a reasonable doubt was itself the result of the workings of a reasonable jury. Thus, the motions for a judgment of acquittal at the conclusion of the evidence were properly denied, and a renewed motions under Rule 29(c) will similarly be denied.

Hence, whether considered as a motion for a new trial under Rule 33, or as a motion for a judgment of acquittal un-

der Rule 29(c), the contention that we should have entered a judgment of acquittal at the conclusion of the evidence must fail. Accordingly, the motion is denied.

### 3. The prosecutor's remarks in opening and closing argument to the jury.

Dabney asserts that certain remarks of the prosecutor in his opening and closing statements to the jury incorrectly set forth that the defendant, in a criminal trial, has the duty to prove his innocence.

The first challenged remark was made by the Assistant United States Attorney at the conclusion of his opening statement to the jury:

What I have just said to you is what I intend to prove at trial. What I have said is not evidence. It is persuasive, if you will, comments. It is what I intend to prove. Mr. Tinari [counsel for Dabney] may or may not tell you what he intends to prove; but I ask you to please afford Mr. Tinari the respect and time that you gave me, and attention. (N.T. 2–46, 47)

Counsel for Dabney did not object to this statement when it was made.

The second comment occurred at the conclusion of the government's closing argument to the jury:

When you listen to Mr. McCaskill [then counsel for Dabney], listen please and see if he tells you how the facts of this case prove that his client is not guilty. I am going to be listening.

Thank you very much. (N.T. 10–50)

Counsel for Dabney objected immediately to this statement by the prosecutor, and the following cautionary instruction was given to the jury immediately thereafter:

Members of the jury, disregard that last statement, because in my instructions I will tell you that it is not the burden or duty of Mr. McCaskill or the defendant to prove his innocence; but I will go into those matters in the detailed instructions later. It is quite clear that the burden and the duty rest with the government to prove every element of the indictment and every element of the crime beyond a reasonable doubt. So, therefore, when you do listen to Mr. McCaskill, it is not up to him to affirmatively prove innocence to you. It is the government's duty to affirmatively prove guilt beyond a reasonable doubt. (N. T. 10–51)

Moreover, in our final instructions to the jury, we specifically referred to this episode in closing argument, and once again cautioned the jury that the defendant did not carry the burden of proving his innocence:

Again, as I have stated to you when in the closing statement Mr. Miller [the Assistant United States Attorney] referred to the fact that you should listen to Mr. McCaskill's argument and see that he convince you of the fact, it is not the burden of the defendant in this case to establish his innocence. The burden is on the government to establish his guilt beyond a reasonable doubt. \* \* \* (N.T. 10–75)

We must determine, therefore, whether the challenged remarks by the prosecutor were prejudicial to Dabney in the context of the entire trial.

We begin with the recent case of United States v. Somers, 496 F.2d 723, 736–742 (3d Cir. 1974), in which the Court of Appeals for the Third Circuit extensively discussed prosecutorial misstatements during argument to the jury. The Court enumerated the following factors as dispositive in determining whether such misstatements were preju-

dicial to the defendant: (1) Were the prosecutor's remarks so gross as to be clearly prejudicial, or were they so diffused as to be ambiguous at most? (2) Was there a contemporaneous objection by defense counsel? (3) Were curative instructions given by the trial judge? (4) Did the prosecutor himself neutralize the objectionable remarks? (5) Was the effect of the objectionable remarks attenuated by the length of the trial? (6) Was there sufficient competent evidence to convict the defendant?

 (1) In the instant case, neither of the challenged remarks was totally free from ambiguity. While both statements seem to suggest that a defendant may have some burden of proof in a criminal case, the first statement could have been interpreted to mean that counsel for defendant might or might not choose to make an opening statement, an observation which had previously been made by the Court to the jury (N.T. 2–28), and the second statement could have meant, as the government contends, that the *facts* should be considered by the jury, and therefore this statement might not be construed as an attempt to shift the burden of proof to defendant. Neither of these contentions, however, could in and of itself save the statements, in the absence of the other factors stressed by the Court in *Somers*.

(2) There was an immediate and vigorous objection by defense counsel after the second statement by the prosecutor. No objection was lodged, however, after the remark made in the opening speech by the Assistant United States Attorney. Were we reviewing this as an appellate tribunal, the failure to object at trial would be fatal to defendant's contention, United States v. Lawson, 337 F.2d 800, 807 (3d Cir. 1964), cert. denied 380 U.S. 919, 85 S.Ct. 913, 13 L.Ed.2d 804 (1965). In the instant case, however, *First*: because we are deciding a motion for a new trial, and not on appeal, and,

*Second:* because there was a substitution of new defense counsel at defendant's request between the first and the second challenged remarks of the prosecutor, we will consider the failure to object to the first statement as a factor, albeit, not itself determinative ,in connection with the asserted prejudice Dabney claims he suffered.

(3) We believe that our curative instructions were sufficiently comprehensive. In addition to the immediate admonition given after the second remark, we defined burden of proof on no less than *nine* separate occasions during our instructions to the jury (N.T. 10–74, 75; 10–76; 10–78; 10–79; 10–82; 10–97; 10–98; 10–102; 10–103). Included in these directions were five separate admonitions to the Jury that the defendant has no duty to present any evidence whatsoever (10–75; 10–81, 82; 10–97; 10–98; 10–103). The force and weight of these instructions, delivered, as they were, before the jury retired to consider its verdict, certainly neutralized any possible prejudicial effect of the prosecutor's comments. See United States v. Leftwich, 461 F.2d 586, 590 (3d Cir. 1972), cert. denied 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178.

(4) The prosecutor himself attempted to counter the second remark when he stated in open court before the jury:

> Your Honor, I am sorry. What I meant to say in summarizing is that I think when we review the facts in this case you will reach a determination based solely on the evidence, not what I say, not what Mr. McCaskill will argue, that the defendant is, in fact, guilty as charged.

> When you deliberate, please go over the charges and the testimony of each individual witness. You will come to the conclusion, I submit, of guilt.

> Again, please give Mr. Caskill your undivided attention. Listen to what he said.

Thank you. (N.T. 10–51)

The immediate explanatory remarks by the prosecutor further diminished the effect of the original misstatement.

(5) The first challenged remark of the prosecutor, to which no contemporaneous objection was made, occurred on May 14, 1974 (N.T. 2–47). The case was submitted to the jury on May 31, 1974, after a recess of nine days to permit trial preparation by new and additional defense counsel. The length of the trial serves to minimize the effect of comments made at the very beginning of the proceedings.

(6) Finally, as noted *supra*, the evidence against Dabney was overwhelming, and was established by competent evidence. Under these circumstances, the potential prejudice in the prosecutor's remarks was minimized.

In considering all of the factors discussed above, within the context of the entire trial, we conclude that the misstatements of the prosecutor did not so prejudice Dabney as to warrant a new trial.

4. *The admissibility of evidence concerning the acts and statements of co-conspirators.*

When Mrs. Kelly testified, counsel for Dabney objected to any questions of the prosecutor with respect to statements made to her by alleged co-conspirators other than Dabney (N.T. 2–61 et seq.). We ruled that such statements were admissible, citing United States v. Rodrigues, 491 F.2d 663 (3d Cir. 1974), and United States v. Bey, 437 F.2d 188 (3d Cir. 1971), with the caveat that a mistrial would be declared, if independent evidence connecting Dabney with the conspiracy was not established (N.T. 2–63).

At the conclusion of the government's case, we made a specific finding that sufficient independent evidence of the conspiracy had been introduced to warrant submission of the matter to the jury (N.T. 10–5).

■■ The law is clear that a trial judge may admit hearsay statements of alleged co-conspirators against a defendant provisionally, "subject to connection", if the evidence previously adduced establishes likelihood of an illicit association, United States v. Bey, *supra*, 437 F.2d at 190. In the instant case, Mrs. Kelly testified that Dabney came to her home with another man (N.T. 2–56), that she went upstairs with her grandchildren (N.T. 2–58), and that five or ten minutes later the doorbell rang. She testified that a few minutes later two men came upstairs, that one of them put a gun to her head, and that the two men tied up her and her grandchildren (N.T. 2–58 to 2–60). Based upon this testimony, there was a "likelihood of an illicit association", *id.* at 190, and we hold that the testimony with respect to statements of alleged co-conspirators was properly admitted, subject to connection.

■ After all of the evidence is of record, the Court must then make a final determination with respect to the admissibility of statements of co-conspirators. We concur in the procedure outlined by Judge Friendly in United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), a decision which was cited with approval in United States v. Bey, *supra*, 437 F.2d at 191:

The circumstance that in a conspiracy trial the preliminary issue on the admissibility of evidence coincides with the ultimate one of the defendant's guilt should not cause the trial judge to abdicate his traditional duty to decide those issues of fact which determine the applicability of a technical exclusionary rule. When the matter is viewed from the standpoint of the trial judge, it may be hard to say more than that he must satisfy him-

self of the defendant's participation in a conspiracy on the basis of the non-hearsay evidence. Morgan, Functions of Judge and Jury in the Determination of Preliminary Questions of Fact, 43 Harv.L.Rev. 165, 182–189 (1929). See also Maguire and Epstein, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv.L.Rev. 392, 415–20 & n. 20 (1927). Setting the standard that high avoids the risk that the requirement of independent evidence will be rendered "virtually meaningless," as some courts are said to have done. *See* Note, Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 922, 987 (1959). While the practicalities of a conspiracy trial may require that hearsay be admitted "subject to connection," the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of the defendant's guilt beyond a reasonable doubt. If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility, * * * declare a mistrial if the defendant asks for it. (footnote omitted)

In the instant case, clearly, there was sufficient evidence, independent of the hearsay statements, to submit Dabney's participation in the alleged conspiracy to the jury.

The initial objection made by defense counsel occurred when the prosecutor asked Mrs. Kelly to tell the jury what was said to her by the two men who bound her (N.T. 2–61). After the Court overruled the objection, she testified that the two men found the key to the family's safe deposit box (N.T. 2–64), and thereafter took her to the basement with a sweater pulled over her head (N.T. 2–66). She also testified that her husband left the house with two of the five men (N.T. 2–70), while three of them remained with her (N.T. 2–70).

Ernest Kelly, Sr. testified that Dabney informed him that he was going to be taken to the bank to get the money in his safe deposit box (N.T. 2–165, 166); that Dabney went to get Kelly's coat, hat, and shoes for the trip to the bank (N.T. 2–165); that Dabney told Kelly to drive to the bank, and sat on the seat next to him during the entire automobile ride (N.T. 2–168); that Dabney also told him that if Kelly got the money and turned it over to them, the people in Kelly's home would not be harmed (N.T. 2–169, 170); that Dabney accompanied him into the bank (N.T. 2–171, 172); that Kelly saw Officer Thomas in the bank, hit Dabney and knocked him out of the way, and fled from the bank (N.T. 2–173, 174).

Officer Thomas testified that Kelly and Dabney entered the bank, that Kelly turned and ran from the bank (N.T. 8–72), that Dabney also ran when Kelly began screaming (N.T. 8–74), and that Thomas chased Dabney out of the bank and apprehended him outside after a chase which clearly was one of hot pursuit (N.T. 8–74 to 8–77).

Based upon this testimony, there was certainly sufficient non-hearsay evidence to link Dabney with the declarants, and to justify submitting the issues of the existence of the conspiracy and of Dabney's alleged participation in it to the jury.

In this motion for a new trial, counsel for Dabney asserts that the Court erred in admitting testimony with respect to the actions and statements of alleged co-conspirators. It is clear from the trial transcript that the motion is based

upon the contention that there was insufficient independent evidence of a joint undertaking to justify admission of the statements of the alleged co-conspirators (N.T. 10–6). We do not agree. For the reasons stated, we have concluded that there was substantial independent evidence which justified the admission of the statements, and accordingly we denied the motion on this ground.

 Counsel for Dabney does *not* assert that the court erred in failing to instruct the jury that Dabney's participation in the conspiracy had to be established without reference to the declarations of alleged co-conspirators, unless there was proof *aliunde* of Dabney's participation in the conspiracy. Even if such a contention were made, however, there was no objection to the Court's charge on conspiracy prior to the submission of the case to the jury, as required by Rule 30 of the Federal Rules of Criminal Procedure. Moreover, the Court of Appeals for the Third Circuit had made it clear that such a failure to instruct the jury is not plain error, when, as in the instant case, the trial court has made the independent determination required by United States v. Bey, *supra*; United States v. Rodrigues, *supra*, 491 F.2d at 666. As the Court noted in United States v. Van Orden, 469 F.2d 461, 464 (3d Cir. 1972), " . . . once the district court determines that the statement is properly admitted under the co-conspirator exception to the hearsay rule, no instruction to the jury is necessary." [9]

Finally, counsel for Dabney has asserted that we erred in admitting testimony with respect to the *actions* of alleged co-conspirators. No grounds for this contention have been offered, nor has the issue been briefed. Since the

matter does not raise hearsay problems, we are unable to understand the reasons, if any, which might be asserted in its support. In any event, we instructed the jury extensively with respect to the manner in which Dabney could be bound by the acts of alleged co-conspirators (N.T. 10–93 to 10–95), and no objection was made to these instructions. Apart from the lack of objection at the time, our independent review satisfies us that no ground for error exists on this score and that the issue is a spurious one.

For all of these reasons, we decline to grant a new trial on the basis of alleged error through the admission of testimony with respect to the actions and statements of alleged co-conspirators. We find that the entire contention lacks merit.

5. *The effect of the conviction of Clark, Christian, and Griffin on murder charges in the District of Columbia.*

 On May 17, 1974, during the course of this trial, John Clark, William Christian, and John Griffin, co-defendants in this case, whose trials were served from Dabney's, were found guilty by a jury in the District of Columbia of murder charges. The victims in the District of Columbia case included women and children, and the proceeding attracted considerable publicity.

On May 28, 1974, counsel for Dabney moved for a mistrial, based upon the publicity surrounding these convictions (N.T. 7–4). The Court denied the motion for a mistrial, and ordered an extensive voir dire of the jury to determine if any of its members had been exposed to prejudicial publicity (N.T. 7–5,

---

9. We are aware of Judge Adams' misgivings in his concurring opinion in Rodrigues, 491 F.2d at 667, n. 10. Judge Adams had been a panel member in *Bey* and *Van Orden*, but continued to find the problem of limiting instructions "particularly nettlesome." However, apart from the lack of any contemporaneous objection by counsel for Dabney, we believe that the standards enumerated by the Court of Appeals for this Circuit were met.

7–10, 11), according to the procedure described in United States v. Addonizio, 451 F.2d 49, 67 (3d Cir. 1972). It is important to note that although these defendants were alleged co-conspirators in the case at bar, Dabney was not implicated in the Washington case nor was he mentioned in any of the publicity attendant to that action.

The voir dire was conducted by us of each juror individually out of the hearing of the other jurors, United States v. Addonizip, *supra*, 451 F.2d at 67 (exercising the supervisory power over the District Courts in this Circuit); see also the ABA Standards Relating to Fair Trial and Free Press, § 3.4(a) (Approved Draft, March, 1968). The questions were as follows:

1. During the recess in this matter from May 17th until today [May 28, 1974], have you had any discussions about the case with anyone?

2. Either during the recess or prior to that time, prior to your becoming a member of the jury, have you heard anything or read anything about any of the following persons: John W. Clark, Richard Dabney, William Christian, John Griffin, Ernest Kelly, Mrs. Thelma Kelly, John Thomas, Detective English [a member of the Philadelphia Police Department involved in the investigation of the case], Agent Larry Doss [the FBI case agent], Agent Richard Schwein [another FBI agent assigned to the case], Mr. Miller of the U.S. Attorney's office, Mr. Mellon of the U.S. Attorney's office, Mr. Tinari [defense counsel], Mr. McCaskill [defense counsel]?

The Court afforded counsel the opportunity to ask additional questions. Counsel for Mr. Dabney asked one question of Juror Leposa (N.T. 7–19), and, after six jurors had been questioned, requested the Court to substitute a general question relating to news media for the phrase "have you read anything?" Counsel stated that the previous questioning had been sufficiently broad, however, to include news media, and specifically informed the Court that it was unnecessary to re-examine those jurors previously questioned (N.T. 7–27).

Mr. Martin was the only juror who stated that the name of one of the defendants, John Griffin, struck a responsive chord, but he was unable to pinpoint any specific frame of reference (N.T. 7–50).

Under these circumstances, we concluded then, and we conclude now, that cause did not exist for the grant of a mistrial on May 28, 1974, because none of the jurors had been exposed to publicity which he or she connected in any way with the events in the trial or with defendant Dabney; [10] or, indeed, with any of the defendants in any other context whatsoever.

6. *The finding of guilt on both Counts II and IV.*

The jury found Dabney guilty of the offenses charged in Counts I, II,

10. We note that both Mr. McCaskill (N.T. 7–6) and Mr. Tinari (N.T. 7–8) expressed approval of the Court's decision to conduct the voir dire of the jurors with respect to their familiarity with persons connected with the case, rather than to ask them directly if they had heard of the conviction in the District of Columbia. The latter questions would have been clearly suggestive and possibly prejudicial to Dabney. In the event that any juror had heard of these persons, the Court would have developed through additional questions the extent, if any, of such knowledge. This additional questioning was, of course, conducted in the case of Juror Martin, and his familiarity with the name John Griffin turned out to be vague and non-prejudicial. Moreover, it is significant that there was never a suggestion or request at any time to sequester this jury. We are satisfied, however, as a result of the extensive questioning of the jury, that this jury was not tainted by any publicity about the other defendants.

IV, and VIII of the indictment. Dabney now asserts that the guilty verdict cannot stand as to Counts II and IV, since he claims that both counts charge the same offense; viz., violations of 18 U.S.C. § 2113(a). In support of this contention Dabney cites two cases from the District of Columbia Circuit, Coleman v. United States, 137 U.S.App.D.C. 48, 420 F.2d 616 (1969), and Bryant v. United States, 135 U.S.App.D.C. 138, 417 F.2d 555 (1969).

After carefully reviewing the record, we conclude that we lack jurisdiction to consider this ground asserted in support of the motion for a new trial.

The trial terminated on May 31, 1974. After the jury returned its verdict, we stated that an extension of time for the filing of post-trial motions would be granted, if such extension were requested; *we said, however, that in any event, the motions must be filed and the matter briefed and argued prior to the date set for sentencing, which was June 27, 1974 (N.T. 10–114 to 116). No extension of time within which to file postrial motions was requested.*

The contention that a finding of guilt on both Counts II and IV would be contrary to law was first raised orally on July 16, 1974 (N.T. 12, July 16, 1974). There was no mention of such ground in the motion for a new trial filed on June 5, 1974, although that motion did purport to reserve the right to file additional reasons at the time of argument.

■ The law is clear in this Circuit that any motion for a new trial, *together with all grounds in support thereof,* must be filed by the defendant within the seven day period mandated by Rule 33 of the Federal Rules of Criminal Procedure, or within such further time as the Court may fix *during the original seven day period,* United States v. Newman, 456 F.2d 668, 670 (3d Cir. 1972). Purported "reservation" clauses which would extend this period are without

force or effect, United States v. Hamilton, 457 F.2d 95, 99–100 (3d Cir. 1972). Moreover, this limitation is said to be *jurisdictional,* United States v. Newman, *supra,* 456 F.2d at 672, and any order of the District Court in contravention thereof is without effect, United States v. Hamilton, *supra,* 457 F.2d at 100.

■ In addition, the reasons in support of the motion for a new trial must be in writing, United States v. Newman, 456 F.2d at 670; see Rule 47, Federal Rules of Criminal Procedure.

In the instant case, we will assume, *arguendo,* that the Court's statement that motions should be filed before June 27, 1974, the date originally set for sentencing, operated as an extension granted within the usual seven day period, under the rule of *Newman.* Even under this construction, which is most favorable to defendant, we lack jurisdiction to consider reasons in support of the new trial motion asserted *orally* on *July 16, 1974.*

■ We note, however, that even if we had jurisdiction to consider this ground urged in support of a new trial, it is wholly without merit. The cases cited by Dabney, Coleman v. United States and Bryant v. United States, *supra,* deal with *conviction* and *sentencing* under the various sections of the federal bank robbery statute. In the instant case, however, neither a judgment of conviction, under Rule 32(b)(1), nor sentence under Rule 32(a)(1), has been entered by the Court. Should a judgment of conviction be entered and sentence imposed upon it, we will, of course, be guided by the admonition of the Court of Appeals for the Third Circuit, *en banc,* in United States v. Corson, 449 F.2d 544, 551 (3d Cir. 1971), that

[t]he only practicable way of implementing [Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957)] is to impose a general sen-

tence on all counts for a term not exceeding the maximum permissible sentence on that count which carries the greatest maximum sentence.

At this juncture, however, Dabney's contention is both premature and erroneous.

The motion for a new trial on the ground that a verdict of guilty on Counts II and IV was contrary to law accordingly will be and is denied.

### 7. The prosecutor's reference in closing argument to the dismissed firearms counts.

Dabney next contends that the government improperly argued the dismissed firearms counts to the jury.

 This ground in support of the motion for a new trial was first asserted in a memorandum filed by counsel for Dabney on October 10, 1974. Under the rule of United States v. Newman and United States v. Hamilton, *supra*, we clearly lack jurisdiction to consider this contention.

Again, assuming, *arguendo*, that we do have jurisdiction, we find this ground to be utterly without merit. The challenged statement of the prosecutor was as follows:

* * * Mr. Dabney had his hands in his pocket. Now, did Mr. Dabney have a gun or is he charged with having a gun? His honor will tell you that certain counts of the indictment have been dropped, an acquittal has been granted with the consent of the government. There is no evidence throughout the entire trial—and I concede—that Mr. Dabney personally, that he himself, carried a gun. There is no evidence of that. You could guess that he carried a gun because he had his hand in his pocket. You could guess that he carried a gun because other people had guns. You could guess that he carried a gun because

there was one found in Mr. Kelly's car. That would be guesswork. We would not want you to convict anyone on speculation. So the count that charges Mr. Dabney with personally carrying a firearm is not in the indictment that will go out with you, they have been deleted, just so you understand that. Numerous other counts are in the indictment, and there is sufficient evidence with respect to them so that you need not guess; all you have to do is think. (N.T. 10–40).

Initially, we note that there was no objection by counsel for Dabney to these comments when made by the prosecutor. Normally, this would be fatal to defendant's contention, at least before an appellate tribunal. See United States v. Lawson, *supra*, 337 F.2d at 807.

 However, we are convinced that the statement of the prosecutor was only intended as an explanation of the deletion of the firearms counts, which had been discussed in the government's opening statement to the jury (N.T. 2–37). As such, these comments were not prejudicial to Dabney.

For these reasons, the motion for a new trial based upon the government's reference in closing to the dismissed firearms counts are denied. Moreover, our instruction on this score made it clear that the firearms count must be disregarded for lack of proof, and that it was no longer a subject for consideration by the jury. (N.T. 10–84, 85).

### 8. The attitude of defense counsel towards Dabney.

 During the course of the trial, friction developed between Dabney and his original defense counsel, Nino Tinari, Esq. Dabney now asserts that this friction (which all parties admit was never discussed before the jury), rendered the proceedings unfair, and is ade-

quate grounds for a new trial in and of itself. We disagree.

Again, we note that this ground was first raised in the memorandum filed October 10, 1974, and that the Court thus lacks jurisdiction to consider it on the merits, United States v. Newman, United States v. Hamilton, *supra*.

■■■ Even if we had jurisdiction, however, we would summarily reject this contention; we have carefully examined the record and have found that all of the incidents which are proffered as evidence of friction between Dabney and Tinari took place out of the hearing of the jury (N.T. 3–23, 3–35, 3–46, 3–99, 3–100, 3–121). Any contention that the friction "poured over into the trial" is speculative and not supported by the record.

Any contention that Dabney was prejudiced by Tinari's absence from the Courtroom after May 29, 1974 (N.T. 8–111) is also speculative, and, further, the record is clear that Tinari was excused at Dabney's own request (N.T. 8–110), and at his behest after the most meticulous explanation to Dabney of the Court's willingness to keep Tinari in the case with Mr. McCaskill, if Dabney so wished (N.T. 5–5, 6).

Accordingly, the motion for a new trial on this ground will be denied.

9. *The substitution of counsel without selection of a new jury.*

Finally, Dabney contends that Tinari selected a predominantly white jury because such a jury would react favorably to white counsel, and that when black counsel, Ronald McCaskill, assumed the defense of the case, a new jury should have been selected.

■■■ Once again, this contention was first raised orally on July 16, 1974 (N. T. 40–49), and thus we lack jurisdiction to consider it on the merits. United States v. Newman, United States v. Hamilton, *supra*.

■■■ Even on the merits, however, we would not grant a new trial on this ground. The issue of jury selection arose on May 15, 1974, and, out of the hearing of the jury, Mr. Tinari took the witness stand and testified under oath:

BY THE COURT:

Q. * * * So I would like you to state—and obviously the jury would not hear this—the reasons for your jury selection that you communicated to Mr. Dabney and what his statements to you were after you communicated them?

A. In speaking with him about whom we should have on the particular jury, two things came to my mind; he agreed. Number 1, they should be all white simply because the incident involved a black victim, and there were black perpetrators in this particular matter. And it was my understanding or my feeling psychologically and he agreed with it, that white people would not be particularly concerned about what happens to black people. In the event that we would get black people who were older, they would feel, of course, it an affront to them. If we get the young blacks, they would, of course, be upset because of the nature of the crime itself; and he agreed with it. And also because of the questions concerning the possibility or probability that the defense may involve the use of the mosque, the Muslims. And he agreed with it. He went along with it at that time.

Though it would be absolutely, totally foolish if we after having the panel then make a motion to have the panel dismissed and

those jurors dismissed on the basis that there wasn't any racial equality when we are in fact seeking to get the white people on the jury, even though initially when I walked into the room upstairs the first thing I said to Mr. Dabney, "I bet you there aren't more than six black people in the entire room up on the first floor." We dismissed the idea then going for blacks.

Q. This was all based on conversation with him; is that correct?

A. Yes, Your Honor.

Q. Was he with you as each member of the jury was selected?

A. Absolutely, Your Honor.

Q. Did you discuss with him the reasons for the selection of each particular panelist?

A. Yes.

Q. Did he register any disagreement?

A. No disagreement. As a matter of fact, he was instrumental in choosing individuals whom I thought should have been stricken. (N.T. 3–52 to 3–54).

We concluded then, and we conclude now, that Mr. Tinari was worthy of belief in his testimony touching upon this matter, and that the jury was selected, with Dabney's concurrence, not because a predominantly white jury would relate to white counsel, but because in their joint judgment arrived at after discussion in depth between them, a predominantly white jury would react more favorably to the circumstances of the alleged offense. It is also significant, that in our view, Mr. Tinari's representation has been exemplary. We are satisfied with the skill and vigor of his advocacy. We substituted Mr. McCaskill, who also acquitted himself in a highly competent manner, in deference to the wishes of Mr. Dabney, even though we could have refused this request, because of the high degree of competency of Mr. Tinari's handling of the case. It was clear, however, that once the substitution was made, the trial was to continue and that substitution of Mr. McCaskill was not to serve as an excuse to abort the trial. Moreover, ample time was afforded new counsel to familiarize himself with the case, (a recess of nine days was afforded him for this purpose).

Indeed, no such contention was made at the time of substitution of counsel, nor noted until raised orally on July 16, 1974.

Again, we rely upon the fact that there has never been any showing of unfairness or bias on the part of the jury. We point out this fact, however, to underscore the fallacy of defendant's position. Had we determined that he could not substitute new counsel for Mr. Tinari, and we could easily have done so, because he was handling the case competently, this issue, in all probability, would not be before us; the substitution of counsel as an accommodation to Dabney, cannot give rise now to a claim that the entire proceeding should have been scrapped, and that the case should have started anew.

Accordingly, the motion for a new trial on this ground is denied.

In summary, we are satisfied after a review of the entire record of pretrial, trial and post-trial matters covering a time span of ten days in court, that defendant had a fair trial and that the verdict of the jury was a proper one.

For the reasons outlined in this opinion, the motions (i) to dismiss the indictment, (ii) in arrest of judgment, and (iii) for a new trial will be denied. An appropriate order will be entered accordingly, and a date will be set for sentencing.

## MEMORANDUM AND ORDER

On May 31, 1974, defendant Richard Dabney was found guilty by a jury on four counts charging him with conspiracy and violation of the federal bank robbery statute. Thereafter, his counsel filed motions for dismissal of the indictment based upon excessive pretrial delay, in arrest of judgment, and for a new trial. After briefing and argument, all of these motions were denied in an Opinion and Order of this Court dated March 6, 1975. On March 13, 1975, Dabney was sentenced to five years on the conspiracy count, to run concurrently with a fifteen year general sentence imposed on the bank robbery counts. See United States v. Corson, 449 F.2d 544, 551 (3d Cir. 1971). At sentencing, Dabney was notified of his right to appeal, as required by Rule 32(a)(2) of the Federal Rules of Criminal Procedure. The judgment of conviction was entered in the criminal docket on March 14, 1975. On March 25, 1975, eleven days after the judgment of conviction was entered on the criminal docket, counsel for Dabney filed a notice of appeal in the District Court.

Rule 4(b) of the Federal Rules of Appellate Procedure requires that a notice of appeal be filed in the District Court "within 10 days after the entry of the judgment * * * appealed from." The 10 day limitation in Rule 4(b), absent a finding of excusable neglect by the trial court, is mandatory and jurisdictional. United States v. Robinson, 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960); United States v. Mathews, 462 F.2d 182, 183 (3d Cir. 1972). Upon such a finding of excusable neglect, however, the District Court may extend the time for filing a notice of appeal for an additional period not to exceed 30 days from the expiration of the time otherwise prescribed by the rule.

Counsel for Dabney, a sole practitioner, represents to the Court that he was prevented from filing a timely notice of appeal because of a viral infection which kept him at his home from Friday, March 21st, until Tuesday, March 25, 1975, and that on his first day back at the office he personally filed the required notice of appeal along with a petition to extend the time for filing pursuant to Rule 4(b). The United States has not challenged the representation of counsel with respect to his illness, and has further stated to the Court that it will not oppose an extension of time within which to file the notice of appeal.

The "excusable neglect" provision of the Rule was added in 1966, in part to avoid the harsh results of cases such as Berman v. United States, 378 U.S. 530, 84 S.Ct. 1895, 12 L.Ed.2d 1012 (1964), which involved the illness of counsel, id. at 1017 (dissenting opinion of Mr. Justice Black, joined by the Chief Justice, and Justices Douglas and Goldberg). See Committee Note of 1966 to Amended Rule 37 of the Federal Rules of Criminal Procedure. The sudden illness of counsel is clearly a circumstance covered by the "excusable neglect" provision of the rule, see 9 Moore's Federal Practice ¶ 204.19, and we so hold under the facts here presented.

An appropriate Order will be entered extending the time for filing a notice of appeal from March 14, 1975, until the date of this Memorandum and Order. The effect of this Order will be to make timely the notice of appeal filed on March 25, 1975.